No. 119,266

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

ERIKA YAZMIN ARCEO-ROJAS,
*Appellant*.

SYLLABUS BY THE COURT

1.

Appellate courts use a bifurcated standard of review when considering a motion to suppress evidence. We review the factual underpinnings of the decision for substantial competent evidence, and we review the ultimate legal conclusion drawn from those facts de novo. Substantial competent evidence exists when a reasonable person could accept the evidence as being adequate to support a conclusion. While engaging in this review, we do not reweigh the evidence, assess witness credibility, or resolve evidentiary conflicts.

2.

The burden is on the State to establish the lawfulness of a warrantless search and seizure.

3.

The Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights both protect individuals against unreasonable searches and seizures. Constitutional issues may arise when a law enforcement officer stops a vehicle

on a public roadway, and therefore restrains an individual's liberty, because the stop constitutes a seizure under the Fourth Amendment.

4.

A police officer may perform a traffic stop if he or she reasonably suspects that the driver committed a traffic infraction.

5.

Reasonable suspicion exists when a law enforcement officer has a specific, objective, articulable basis for believing that the person being detained is committing, has committed, or is about to commit a crime.

6.

The existence of reasonable suspicion is a question of law.

7.

If an officer executed a traffic stop without reasonable suspicion that the driver was committing a traffic infraction or crime, then the evidence discovered later during that stop may be suppressed under the exclusionary rule.

8.

The courts are to construe statutes to avoid unreasonable or absurd results.

9.

A traffic stop may become unlawful if it is prolonged beyond the time reasonably required to issue a citation or a warning ticket.

10.

The mission of a traffic stop includes checking the driver's license, determining whether the driver has outstanding warrants, reviewing the car's registration, and reviewing the car's proof of insurance. Dog sniffs are not part of a traffic stop's mission.

11.

A police officer may extend a traffic stop if the police officer develops reasonable suspicion or probable cause to believe another crime has occurred during the traffic stop.

12.

Reasonable suspicion is a lower standard than probable cause. What is reasonable depends on the totality of circumstances in the view of a trained law enforcement officer. In determining whether reasonable suspicion exists, the court must judge the officer's actions in light of common sense and ordinary human experience.

13.

The totality of the circumstances standard allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them. A reviewing court must give due weight to the factual inferences drawn by both the trial court and the law enforcement officers. The totality of the circumstances standard does not envision a reviewing court labeling or ranking each factor as to innocent or suspicious appearances. Instead, the court determines whether all the circumstances justify the detention. The relevant inquiry is not whether particular conduct is innocent or guilty but whether a sufficient degree of suspicion attaches to particular types of noncriminal acts. The totality of the circumstances standard precludes a divide-and-conquer analysis under which factors that are readily susceptible to an innocent explanation are entitled to no weight.

14.

A police officer need not ignore evidence that another crime occurred when completing a traffic stop. A police officer may broaden his or her inquiry when the detainee's actions and the circumstances suggest a crime unrelated to the traffic stop has occurred.

15.

Discrepancies in travel plans or histories have been used as objective reasonable suspicion factors, depending on the nature of the discrepancy. As with unusual travel plans, inconsistencies in information provided to the officer during the traffic stop may give rise to reasonable suspicion of criminal activity. Discrepancies that arouse suspicion include an individual's internally inconsistent statements and the inconsistencies between a passenger and driver's statements regarding travel plans.

16.

Because air freshener and other strong fragrances are known for masking drug odor, air freshener and other strong fragrances may contribute to a police officer's reasonable suspicion.

Appeal from Geary District Court; RYAN W. ROSAUER, judge. Opinion filed February 7, 2020. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Tony Cruz*, assistant county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., GREEN and BUSER, JJ.

GREEN, J.:  Lieutenant Justin Stopper stopped Erika Yazmin Arceo-Rojas on I-70 for driving too long in the left lane and an unsafe lane change. During the traffic stop he

4

began to suspect that Arceo-Rojas and her passenger were transporting illegal drugs. After completing the traffic stop, he detained Arceo-Rojas until a K-9 unit arrived and performed a dog sniff of her car. The dog signaled that he detected drugs in the car. When Lieutenant Stopper searched the car, he found a large quantity of marijuana. The State charged Arceo-Rojas with possession of marijuana with intent to distribute and with no drug tax stamp. Arceo-Rojas moved to suppress the drug evidence. The trial court denied her motion and convicted her on both counts after a bench trial. Arceo-Rojas appeals, arguing that Lieutenant Stopper lacked a legally recognized reasonable suspicion for both the initial traffic stop and the later extension of the stop while waiting for the K-9 unit. For the reasons stated later, we affirm.

On November 4, 2016, Lieutenant Justin Stopper of the Geary County Sheriff's Department stopped a car on I-70; the driver was later identified as Arceo-Rojas. Lieutenant Stopper is an eight-year veteran of the Geary County Sheriff's Department. Before that, he was employed for two years as an officer with the Junction City Police Department. In training for employment in law enforcement, Lieutenant Stopper attended three academies, including the Law Enforcement Training Center, where he successfully completed his course of study. Since his certification as a police officer, Lieutenant Stopper testified that he had completed about 400 hours of additional training which is required to maintain his certification as a police officer. Of particular relevance to this appeal, in addition to the 400 hours of general law enforcement training, Lieutenant Stopper testified that he had received over 300 hours in specialized training specifically related to criminal and drug interdiction.

Lieutenant Stopper stopped Arceo-Rojas for two alleged traffic offenses. But while conducting the traffic stop, he began to suspect Arceo-Rojas was trafficking drugs. After completing the traffic stop, Lieutenant Stopper detained Arceo-Rojas until a K-9 officer came to the scene and completed a dog sniff of Arceo-Rojas' car. When the dog

signaled, Lieutenant Stopper searched the car and found marijuana in a large black duffel bag.

The State charged Arceo-Rojas with possession of marijuana with intent to distribute and no drug tax stamp. Arceo-Rojas moved to suppress the drugs and other evidence found as a result of the stop and search. The trial court held a hearing on the motion on May 22, 2017.

Lieutenant Stopper testified that on November 4, 2016, he stopped Arceo-Rojas for "lingering in the left lane" and an "unsafe lane change." He stated that when he first observed Arceo-Rojas' car, she was driving in the left lane on I-70 next to another car in the right lane; both cars were going 74 mph. He testified that Arceo-Rojas remained in the left lane without passing the other car—and in fact "fell back" behind the other car at one point—for at least 3 miles.

With respect to the "unsafe lane change," Lieutenant Stopper testified that his car, Arceo-Rojas' car, and the car in the right lane crested a hill where another police car sat stationary at the side of the road. The car in the right lane slowed down, and then Arceo-Rojas "overtook that vehicle, turned her turn signal on, and then cut over in front of that vehicle and left well less than a second following distance for the vehicle behind it."

Lieutenant Stopper testified that after he stopped Arceo-Rojas' car, he walked up to the passenger side of the car and asked Arceo-Rojas for her driver's license and car rental documents. As he approached the car, he noticed that Arceo-Rojas had not turned her right turn signal off and he attributed this to possible "auditory exclusion," when a person is so stressed out that they "block out" background sounds. Once at the car, he noticed that both Arceo-Rojas and her passenger appeared to be very stressed, evident by "breathing patterns and a visible heartbeat in their stomach area." He also noticed a "strong fragrance" coming from inside the car—which he perceived as either a type of

6

perfume or an air freshener—that dissipated quickly. He noted a large black duffel bag in the back of the car, surrounded by scattered clothes and suitcases.

Lieutenant Stopper also testified that he read the rental agreement. It showed that the car was rented on November 2 in Washington state and was due back November 7 in the same location. He testified that based on his years of experience in law enforcement and "over 300 hours in specialized training," he knew that drug traffickers frequently make "really short, fast trips" to limit their exposure to law enforcement. Lieutenant Stopper stated that the rental agreement showed the car was rented to the passenger's husband, who was not present. According to Lieutenant Stopper, drug traffickers frequently use rental cars rented by third parties not actually traveling in the car. Lieutenant Stopper admitted that the passenger told him the car's rental period could be extended.

Lieutenant Stopper stated that he took Arceo-Rojas' driver's license and reviewed the rental agreement. He asked Arceo-Rojas to come back to his police car with him; she complied. In the police car, Lieutenant Stopper asked Arceo-Rojas about her travel plans. Arceo-Rojas told Lieutenant Stopper that she and the passenger were driving from Washington to Cleveland, Ohio, because she had a possible job transfer to Cleveland; she stated that they intended to stay in Cleveland for a couple days. Arceo-Rojas also told Lieutenant Stopper that she and the passenger rented the car. She also stated that she was in a dating relationship with the passenger.

After questioning Arceo-Rojas in the car and running a warrant and criminal history check on her, Lieutenant Stopper walked back to the rental car to question the passenger about the pair's travel plans. The passenger told him that "[o]riginally, they were going to go to Utah, but then they changed their mind and said they were going to Cleveland." Lieutenant Stopper testified that when he asked the passenger why they were going to Cleveland, she stated that they were going to buy some sports jerseys because

7

Arceo-Rojas' favorite sports team was in Cleveland. Later, she mentioned that Arceo-Rojas might have a job possibility in Cleveland. The video, however, shows that the first reason the passenger gave for the trip was for Arceo-Rojas' job and that Arceo-Rojas wanted to move. She further stated that she did not know how long they would stay in Cleveland, but she had two weeks off work. The passenger also stated that her husband had rented the car because she did not have a credit card. Lieutenant Stopper testified that the longer he remained in contact with the passenger and Arceo-Rojas, the more stressed they appeared.

Next, Lieutenant Stopper walked back to his police car to write Arceo-Rojas a citation. He continued to question Arceo-Rojas about her travel plans. He asked why the pair was using I-70 to travel to Cleveland from Washington, as I-70 was significantly farther south than other available interstate routes, thus adding time to their trip. Arceo-Rojas responded that she was following her GPS. Lieutenant Stopper testified that a lot of times drug traffickers use nondirect routes to their destinations to avoid law enforcement. Then, Lieutenant Stopper issued Arceo-Rojas a notice to appear for "improper driving on a lane roadway" and returned her license and the rental documents. He asked if he could search her car; she refused. He asked if she would wait for a K-9 to come to the scene and sniff her car; she refused. At this point Lieutenant Stopper had already called a K-9 officer who was en route but had not yet arrived. Lieutenant Stopper decided to detain Arceo-Rojas until the K-9 unit arrived a short time later. Lieutenant Stopper stated that he decided to detain Arceo-Rojas because of the totality of the circumstances, including

> "the heavy odor coming from the vehicle, the travel plans stated by the occupants, basically the disparity in travel plans, the large black duffel bag—that was part of it, not a whole lot of it, but that was [a part] of it—the extreme off route that they were in, the obvious signs of stress that they were exhibiting."

8

The State introduced into evidence Lieutenant Stopper's dashboard camera video showing his encounter with Arceo-Rojas' car and the eventual traffic stop of the car. The State also introduced into evidence the video footage from inside Lieutenant Stopper's car when he questioned Arceo-Rojas in the car. The State played the videos for the trial court.

Lieutenant Stopper testified that he detained Arceo-Rojas until an officer and his K-9, Barney, arrived about four to five minutes later. The officer had Barney sniff the perimeter of Arceo-Rojas' car and Barney signaled, indicating that he detected drugs. The officer told Arceo-Rojas that Barney had signaled, and he asked if she had marijuana in the car. She indicated there was marijuana in the car but she did not know how much because someone else had put it in the car. In a large black duffel bag, Lieutenant Stopper found 51 vacuum-sealed bags of marijuana. In total, the individually packaged bags weighed 54 pounds.

Arceo-Rojas, through counsel, cross-examined Lieutenant Stopper. He acknowledged that at no point during the stop did he smell marijuana. He admitted that he did not see Arceo-Rojas shaking when he questioned her, nor did she fumble her license or the rental documents when she produced them. He stated that the passenger told him that her husband rented the car, and she could extend the rental period if she wanted.

Arceo-Rojas argued that Lieutenant Stopper lacked reasonable suspicion to stop her. She contended that she was using the left lane only to pass and that she gave the other car "ample room" when she merged back into the right lane. She also argued that Lieutenant Stopper did not have articulable and reasonable suspicion to extend the stop so that a drug dog could come and search Arceo-Rojas' car. The State argued that Lieutenant Stopper had reasonable suspicion to stop Arceo-Rojas because he followed her car for "a couple of miles" while she drove in the left lane without passing the car in

9

the right lane. In addition, when she did pass the other car, she left less than a two-second gap between her car and the one behind her. The State argued that based on all of his observations, Lieutenant Stopper had reasonable suspicion that Arceo-Rojas' car had drugs inside, and thus reasonable suspicion to call a K-9 unit to perform a drug search.

The trial court denied Arceo-Rojas' motion to suppress. The trial court concluded that Lieutenant Stopper had "reasonable and articulable suspicion that Ms. Arceo-Rojas was staying in the left lane in violation of" K.S.A. 2018 Supp. 8-1522. The trial court also concluded that Lieutenant Stopper had "reasonable and articulable" suspicion that Arceo-Rojas failed to maintain a safe distance between her car and the car behind her. Finally, the trial court held that based on the body spray, rental vehicle taken out in a third party's name, strange travel plans, duffel bag in the back, and shifting stories, Lieutenant Stopper had reasonable suspicion to extend the stop to do a K-9 sniff.

After a bench trial, the trial court found Arceo-Rojas guilty on both counts. The trial court sentenced Arceo-Rojas to 36 months of probation with an underlying 98-month prison sentence. Arceo-Rojas timely appealed.

*Did the Trial Court Err When It Denied Arceo-Rojas' Motion to Suppress?*

Here, Arceo-Rojas contends that the trial court erred by denying her motion to suppress. She contends that the drugs and other evidence found during the search of her car should be suppressed as the fruit of the poisonous tree because Lieutenant Stopper lacked a reasonable suspicion to stop her and to later detain her for the purpose of a drug dog sniff. See *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The State maintains that the trial court did not err.

*Standard of review*

> "Appellate review of a motion to suppress evidence is bifurcated: The factual underpinnings of the decision are reviewed for substantial competent evidence while the ultimate legal conclusion drawn from those facts is reviewed de novo. Substantial competent evidence is evidence that a reasonable person could accept as being adequate to support a conclusion. We do not reweigh the evidence, assess witness credibility, or resolve evidentiary conflicts. [Citations omitted.]" *State v. Boggess*, 308 Kan. 821, 825, 425 P.3d 324 (2018).

The burden is on the State to establish the lawfulness of a warrantless search and seizure. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018).

*Preservation*

At the start of her bench trial, Arceo-Rojas entered a standing objection to the admission of evidence resulting from the stop and search of her car because she argued that the stop and search were illegal. Thus, she sufficiently preserved this issue for our review under K.S.A. 60-404. See *State v. Richard*, 300 Kan. 715, 726, 333 P.3d 179 (2014).

*Was the initial traffic stop lawful?*

> "[W]hen a law enforcement officer displays authority and restrains an individual's liberty by stopping a vehicle on a public roadway, constitutional issues arise because a seizure occurs within the meaning of the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights, both of which protect individuals against unreasonable searches and seizures." *State v. Jones*, 300 Kan. 630, 637, 333 P.3d 886 (2014).

11

A police officer may perform a traffic stop if he or she reasonably suspects that the driver committed a traffic infraction. *City of Norton v. Wonderly*, 38 Kan. App. 2d 797, 802-03, 172 P.3d 1205 (2007). Reasonable suspicion is "a specific, objective, articulable basis for believing that the person being detained is committing, has committed, or is about to commit a crime." *State v. Kraemer*, 52 Kan. App. 2d 686, 692, 371 P.3d 954 (2016). "Whether reasonable suspicion exists is a question of law." *State v. Lowery*, 308 Kan. 359, 364, 420 P.3d 456 (2018). If an officer executed a traffic stop without reasonable suspicion that the driver was committing a traffic infraction or crime, then the evidence discovered later during that stop may be suppressed under the exclusionary rule. See *State v. Powell*, 299 Kan. 690, 694-95, 325 P.3d 1162 (2014) ("When evidence is illegally obtained, its suppression may be warranted under the exclusionary rule, which is a judicially created rule that safeguards against unconstitutional searches and seizures by suppressing illegally seized evidence as a deterrent to future violations.").

Here, Arceo-Rojas contends that Lieutenant Stopper lacked reasonable suspicion to stop her car in the first place. The State maintains that Lieutenant Stopper had reasonable suspicion to stop Arceo-Rojas for violating two provisions of the traffic code: K.S.A. 2018 Supp. 8-1522(c), and K.S.A. 2018 Supp. 8-1522(a).

K.S.A. 2018 Supp. 8-1522(c) requires:

"Upon a highway located outside the corporate limits of any city divided into two lanes of traffic proceeding in the same direction, all vehicles shall be driven in the right lane except when:
  (1) Overtaking and passing another vehicle;
  (2) preparing to make a proper left turn;
  (3) otherwise directed by official traffic-control devices; or
  (4) otherwise required by other provisions of law."

12

Arceo-Rojas does not dispute that she drove in the left lane; she also does not contest the trial court's factual findings. Instead, she insists that she complied with K.S.A. 2018 Supp. 8-1522(c)(1) because she was using the lane to overtake or pass the car in the right lane. Arceo-Rojas contends that "neither in the plain language of the statute, nor in the common-meaning of the words used in the statute, does it establish any distance or time parameters to complete the overtaking or passing maneuver." Thus, she argues, "a driver is only in violation of [K.S.A. 2018 Supp. 8-1522(c)], if the driver is not in the process of catching up with and passing another car, while traveling in the left-most lane. Taking 'too long' to pass is not restricted by the language of the statute."

As the State points out, this argument is unconvincing. The State maintains that Arceo-Rojas violated K.S.A. 2018 Supp. 8-1522(c) because she was driving in the left lane without passing the car in the right lane or otherwise fulfilling one of the delineated exceptions. The State notes that Lieutenant Stopper testified that both Arceo-Rojas and the car next to her in the right lane were going 74 mph. The State argues that "[d]riving the same speed is not overtaking, and the only reason the defendant was finally able to pass the [car next to her] was because it slowed down." Further, Lieutenant Stopper testified that at one point while Arceo-Rojas was in the left lane, her car "actually fell back a little bit" behind the car in the right lane. Finally, the State emphasizes that it "did not have to prove beyond a reasonable doubt that the defendant violated K.S.A. [2018 Supp.] 8-1522(c), but rather there was reasonable and articulable suspicion that the defendant may [have] violated K.S.A. [2018 Supp.] 8-1522(c)."

Pointing out what the trial court needed to decide if Lieutenant Stopper had properly stopped Arceo-Rojas' car for a traffic violation, the court stated the following:

"So let's talk about the traffic stop first. The issue that the Court always seems to have when it comes to these traffic stops, is the difference between a reasonable and articulable suspicion and reasonable doubt. And the bottom [line] is that a lot of what, if

13

not everything, defense counsel said about the existence or lack thereof, of a traffic violation, is correct. In the most general sense of the term correct in that, would a jury convict defendant of—of the traffic violations? And the answer is maybe, maybe not. But the issue that this Court has to consider is at the time, on November 4, 2016, was there a reasonable and articulable suspicion of traffic violations?"

The trial court then highlighted Lieutenant Stopper's testimony concerning the traffic stop:

"So, in this case, on November 4, 2016, Lieutenant Stopper observes who he later determines to be Ms. Rojas, driving eastbound on I-70, roughly mile-marker 308, and he pulls out to follow the vehicle. And prior to doing that, he observed what he thought was Ms. Rojas staying in the left lane. And so he follows Ms. Rojas and is able to see, according to his testimony, that Ms. Rojas is, basically, staying in the left lane. And, at one point, he takes a radar reading of the vehicle that he's following in the left lane, which is Ms. Rojas, and then the vehicle in the right lane, they're going 74 miles per hour. He follows them for about three miles. She maintains her position in the left lane, does not pass the vehicle, does not get back into the lane behind the vehicle. And so Lieutenant Stopper believes that there's a reasonable and articulable suspicion."

The trial court, in its conclusion, stated the following: "So the state law on this is—is clear, at least in the way it's written. And from the prospective of a—of a reasonable officer, there was a reasonable and articulable suspicion that Ms. Arceo-Rojas was staying in the left lane in violation of that statute."

Arceo-Rojas points out that "[t]he common-meaning definition of 'overtake' is to 'catch up with and pass while traveling in the same direction.' Pocket Oxford English Dictionary, 640 (Oxford University Press, 2005)." Lieutenant Stopper likely reasonably concluded that when Arceo-Rojas was driving the same speed as the car in the right lane, and in fact falling behind it, she was not catching up with and passing that car. At the trial court level and on appeal, Arceo-Rojas argued that her shared speed and falling behind

14

could have been a result of her using cruise control. Nevertheless, the simple fact that she could have been using the cruise control does not mean she could not have violated K.S.A. 2018 Supp. 8-1522(c) since this statute makes no exception for its application when a driver is using cruise control.

Although Arceo-Rojas argues in her brief, hypothetically, that "if a car is traveling at 74.1 miles per hour, while the car on the right lane is traveling at 74 miles per hour, as long as the car on the left lane is catching up to pass that car, it does not matter how long it takes for the car to pass . . . ." This is an unreasonable interpretation of K.S.A. 2018 Supp. 8-1522(c). For example, Lieutenant Stopper's car video showed that when he was behind Arceo-Rojas' car, the driver of a grey SUV attempted to pass her car by getting in behind her car while she was driving in the left lane. Nevertheless, Arceo-Rojas continued to drive in the left lane, not passing the white SUV in the right lane which she was driving along side. Out of frustration, the driver of the grey SUV who was trying to use the left lane to pass the white SUV, which Arceo-Rojas was driving alongside, moved to the right lane. As Lieutenant Stopper drove past the grey SUV, the driver looked towards Lieutenant Stopper and pointed in the direction of Arceo-Rojas' car.

The dissent contends that Arceo-Rojas' driving in the left lane did not violate K.S.A. 2018 Supp. 8-1522(c) because the statute does not state how long a person may drive in the left lane before committing a violation. The dissent points out the following: "It is hard to determine when a driver's actions would violate the statute." Slip op. at 32 (Arnold-Burger, C.J., dissenting). Yet, in both the trial court and on appeal, Arceo-Rojas has never claimed that the statute is unconstitutionally vague or ambiguous so that issue is not before us. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014) (Issues not raised before the trial court may not be raised on appeal.); *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018) (An issue not briefed is deemed waived or abandoned.).

15

Nevertheless, the dissent acknowledges that Arceo-Rojas' vehicle drove side-by-side next to the white SUV or slightly set off from it for the entire time Lieutenant Stopper observed it. Moreover the dissent concedes that Lieutenant Stopper observed Arceo-Rojas driving in this manner "over the course of 3 miles," during which Arceo-Rojas drove the same speed as the white SUV. Slip op. at 33 (Arnold-Burger, C.J., dissenting). Clearly, Arceo-Rojas use of the left lane in this way restricted the use of the left lane of travel. In addition, it certainly interfered with other drivers' ability to pass using the left lane. K.S.A. 2018 Supp. 8-1522(c) clearly exists to prohibit driving in this manner because doing so prohibits other vehicles from safely using the left lane for its intended purpose: passing. Besides, the simple fact that Arceo-Rojas' vehicle drove the same speed as the white SUV over the course of 3 miles shows that Arceo-Rojas had no immediate intention to pass the white SUV. Indeed, Arceo-Rojas implicitly conceded this fact when she apologized to Lieutenant Stopper for her "left lane violation."

The courts are to construe statutes to avoid unreasonable or absurd results. *State v. Frierson*, 298 Kan. 1005, 1013, 319 P.3d 515 (2014). Arceo-Rojas explicitly concedes that under her interpretation of K.S.A. 2018 Supp. 8-1522(c), the "[o]vertaking and passing another vehicle" could "take a considerable amount of time and distance." Moreover, she argues that this does not matter under the plain language of K.S.A. 2018 Supp. 8-1522(c) because it "only speaks to the purpose of the car's occupation of the lane, not how long it stays there to achieve such purpose."

We reject this interpretation. In the light of traffic history, we interpret the Kansas Legislature's use of the phrase "[o]vertaking and passing another vehicle" under K.S.A. 2018 Supp. 8-1522(c) shows a legislative intent to keep multilane roads and highways open for passing. Moreover, the Legislature's intent in keeping the left lanes open for passing helps to move traffic more smoothly and to prevent traffic buildup. Thus, we conclude that the trial court's factual findings and conclusions of law, based on Lieutenant Stopper's testimony, are supported by substantial competent evidence.

16

To summarize, in light of Lieutenant Stopper's testimony that he observed Arceo-Rojas driving in the left lane traveling 74 mph while the car next to her was also traveling 74 mph; that he observed her doing so for several miles from at least the 308 mile marker to the 311 mile marker; and that Arceo-Rojas in fact "fell back" behind the car in the right lane at one point while she was in the left lane, we conclude that Lieutenant Stopper had reasonable suspicion that Arceo-Rojas was driving in the left lane without meeting any of the four exceptions under K.S.A. 2018 Supp. 8-1522(c).

The trial court also found that Lieutenant Stopper had reasonable suspicion that Arceo-Rojas committed an unsafe lane change in violation of K.S.A. 2018 Supp. 8-1522(a). The dissent raises questions about Lieutenant Stopper's credibility in this regard. The dissent writes: "Stopper never mentioned anything to [Arceo-Rojas] about an unsafe lane change and did not include it in the warning ticket, although he claimed at the preliminary hearing and at the motion to suppress hearing that it was another basis for the stop." Slip op. at 30 (Arnold-Burger, C.J., dissenting). But the district court specifically found "all of the facts that Lieutenant Stopper testified about, regarding the following of the vehicle, the—the Court is finding that that is what happened, in other words." Quite simply, an appellate court does not assess witness credibility, that is the function of trial courts. *Boggess*, 308 Kan. at 825. The trial court ruled that Lieutenant Stopper's testimony about the basis for the car stop was credible, and we may not challenge that finding.

Nevertheless, having concluded that Lieutenant Stopper had reasonable suspicion that Arceo-Rojas violated K.S.A. 2018 Supp. 8-1522(c), we need not address whether Lieutenant Stopper also had reasonable suspicion that Arceo-Rojas violated K.S.A. 2018 Supp. 8-1522(a). A police officer need only have reasonable suspicion of a single traffic infraction to justify a stop. The stop here was legal because it was justified by Lieutenant Stopper's reasonable suspicion that Arceo-Rojas violated K.S.A. 2018 Supp. 8-1522(c).

17

Similarly, this court need not address whether Lieutenant Stopper made a "reasonable mistake" of law when he stopped Arceo-Rojas, based on the holding in *Heien v. North Carolina*, 574 U.S. 54, 66, 135 S. Ct. 530, 190 L. Ed. 2d 475 (2014).

*Was Extension of the Traffic Stop Lawful?*

Next, Arceo-Rojas argues that even if the initial traffic stop was lawful, Lieutenant Stopper nevertheless lacked reasonable suspicion to detain her until the K-9 unit arrived. Arceo-Rojas does not challenge the trial court's factual findings, but rather disputes the trial court's ultimate legal conclusion. The State maintains that Lieutenant Stopper had reasonable suspicion to detain Arceo-Rojas based on the facts he articulated in court.

In *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S. Ct. 834, 160 L. Ed. 2d 842 (2005), the United States Supreme Court cautioned that "[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Later in *Rodriguez v. United States*, 575 U.S. 348, 356, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015), the United States Supreme Court clarified that "a dog sniff is not fairly characterized as part of the officer's traffic mission." The traffic stop mission typically includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." 575 U.S. at 355. Nevertheless, a police officer may extend the traffic stop if he or she develops reasonable suspicion or probable cause to suspect other crimes while performing the traffic stop's mission. 575 U.S. at 355. As our Supreme Court noted in *State v. Jimenez*, 308 Kan. 315, 324, 420 P.3d 464 (2018), police need not perform the traffic stop mission "with a blind eye." Our Supreme Court stated in *State v. Morlock,* 289 Kan. 980, 996, 218 P.3d 801 (2009):

"An officer is not required to disregard information which may lead him or her to suspect independent criminal activity during a traffic stop. When 'the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions.' [Citation omitted]."

Whether reasonable suspicion exists is a question of law, which this court reviews de novo; this court reviews the factual findings underlying a finding of reasonable suspicion for substantial competent evidence. *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017). Reasonable suspicion is a lower standard than probable cause; it is a "'particularized and objective basis'" for suspecting the person stopped of criminal activity. *State v. Schooler*, 308 Kan. 333, 352, 419 P.3d 1164 (2018). Reasonable suspicion requires articulation of "[s]omething more than an unparticularized suspicion or hunch." *State v. DeMarco*, 263 Kan. 727, 735, 952 P.2d 1276 (1998).

"The totality of the circumstances standard 'allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.' *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). A reviewing court must give 'due weight' to the factual inferences drawn by both the district court and law enforcement officers. *Ornelas v. United States*, 517 U.S. 690, 699, 116 S. Ct. 1657, 134 L. Ed. 2d 911 (1996).

"The totality of the circumstances standard does not envision a reviewing court pigeonholing each factor as to innocent or suspicious appearances. Instead, the court determines whether all the circumstances justify the detention.

"'"The relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but whether a sufficient degree of suspicion attaches to particular types of noncriminal acts. [Citation omitted.] The totality of the circumstances standard precludes a 'divide-and-conquer analysis' under which factors that are 'readily susceptible to an innocent explanation [are] entitled to "no weight."' [Citations omitted.]"' *Sharp*, 305 Kan. at 1081-82." *Schooler*, 308 Kan. at 352.

During the hearing on the motion to suppress before the trial court and in its brief before us, the State argued that Lieutenant Stopper had a reasonable suspicion to detain

Arceo-Rojas because his observations during the initial traffic stop led him to believe that Arceo-Rojas and her passenger were engaged in criminal activity. Nevertheless, Arceo-Rojas argues that "[i]n [Lieutenant Stopper]'s reasoning for his hunch, nothing is particularized, only a list of facts who may in fact be curious but does not specifically indicate that an individual driving cross-country is committing a crime." Arceo-Rojas also emphasizes that the trial court here stated that its decision on reasonable suspicion to extend the stop was "close."

The trial court here did say that its decision was close. It concluded that Lieutenant Stopper had reasonable suspicion of criminal activity based mostly on the pair's travel plans, including the fact that Arceo-Rojas was taking such an out-of-the-way route to Cleveland from Washington. The trial court noted that their plans apparently changed, as the passenger stated that they were going to go to Utah but then decided to go to Cleveland. The trial court highlighted the suspiciousness of the rental agreement and the pair's stated travel plans:

> "If the primary purpose of the trip is work-related, then why a five-day rental where the rental agreement is from 2 November to 7 November? And, sure, it can be extended, but if you know you're going to drive two-thirds the way across the country for work, a normal driver is just going to rent the vehicle for the time it's going to take to do that. And you can imagine, then, if you're going out there for work, you can stay there for a few days and then you're going to come back. Using the ways of the world, a five-day trip is going to, basically, mean you're going to Cleveland and almost doing an immediate U-turn so you can get back to Washington. So a reasonable officer would have some suspicion about that."

The trial court also pointed out that it was suspicious that the car was rented by someone who was not on the trip. The trial court further stated that the strong air freshener smell and the suitcases in the back of the car and the clothing strewn about, when combined with the earlier factors, also contributed to reasonable suspicion.

20

Arceo-Rojas compares this case to *Demarco*, 263 Kan. 727. According to our Supreme Court, *DeMarco* was another "close" case dealing with suppression of drugs found after a traffic stop. 263 Kan. at 741. There, the trooper testified that he relied on several factors to develop "reasonable suspicion":  the driver's use of I-70 to get from California to Florida, slight inconsistencies between the passenger (Bennici) and driver's (DeMarco) accounts of how the trip began, the fact that the car was rented by a third-party that was not present, the fact that the pair's trip began in Los Angeles, and above all, the driver's nervousness. 263 Kan. at 730. The trial court

> "observed that of the four factors [the trooper] identified at the preliminary hearing, three of them were subjective (nervousness, use of a rental car, driving from Los Angeles) and only one was objective (inconsistency in DeMarco's and Bennici's stories about how DeMarco traveled to Los Angeles from Florida). The judge felt that inconsistency was weakened because DeMarco and Bennici did not arrive in Los Angeles at the same time." 263 Kan. at 731-32.

Thus, the trial court suppressed the drug evidence. On appeal, our Supreme Court affirmed the suppression order. It ruled that "nervousness alone does not provide sufficient reasonable suspicion of illegal activity." 263 Kan. at 738. Our Supreme Court noted that travel plan inconsistencies, vague travel plans, or unusual travel plans can contribute to reasonable suspicion. 263 Kan. at 739. Nevertheless, our Supreme Court characterized the passenger and driver's inconsistent statements about travel plans as "not as marked as the inconsistencies in cases we have reviewed denying suppression." 263 Kan. at 740. With respect to the pair's trip originating in Los Angeles and their use of a rental car, our Supreme Court noted that "[t]hese two factors cover large groups" and the Court "f[ou]nd no explanation in the record why existence of an absentee renter would suggest involvement in criminal activity." 263 Kan. at 741. Thus, our Supreme Court concluded that based on the totality of the circumstances, the trooper lacked reasonable suspicion that the pair was involved in criminal activity.

21

Arceo-Rojas' comparison to *DeMarco* is not persuasive because as our Supreme Court noted in *Schooler*, "'assessing whether an officer unreasonably prolonged a stop involves "highly fact-specific inquiries."' *United States v. Hill*, 849 F.3d 195, 201 (4th Cir. 2017)." *Schooler*, 308 Kan. at 335. As the State points out in its brief, the specific facts in this case weigh more heavily towards a finding of reasonable suspicion than the facts in *DeMarco*.

*Travel plans*

The trial court here emphasized that Arceo-Rojas' implausible and inconsistent travel plans were the foundation for its finding of reasonable suspicion. According to Arceo-Rojas, she and the passenger were driving from Washington to Cleveland. Nevertheless, the pair was stopped while traveling eastbound on I-70 in Geary County, Kansas, which is significantly further south than more direct available interstate routes. The pair's route did not make sense for their given destination; this can contribute to reasonable suspicion. See *DeMarco*, 263 Kan. at 739 (recognizing both "unusual travel plans" and inconsistencies in explanations of travel plans as contributing to reasonable suspicion). Arceo-Rojas' attempted explanation that her GPS told her to take this route also did not lessen reasonable suspicion because, as Lieutenant Stopper explained, GPS devices tell people the "shortest and quickest route" and based on his knowledge of the country's interstate system, I-70 was not the shortest and quickest route from Washington to Cleveland.

Moreover, Lieutenant Stopper testified that Arceo-Rojas' travel plans were implausible for another reason: "Over the course of my career, I've spoken with tens of thousands of motorists. I know it's highly uncommon for somebody to travel longer than they stayed at a location; i.e., travel for three days to a city across the country, stay one day, and then drive three days back. That's highly unusual."

22

Not only were Arceo-Rojas' travel plans implausible, but Lieutenant Stopper correctly noted inconsistencies in her plans. Inconsistencies in travel plans can contribute to reasonable suspicion. See *Schooler*, 308 Kan. at 354 ("Discrepancies that arouse suspicion include 'an individual's internally inconsistent statements [and] the inconsistencies between a passenger and driver's statements regarding travel plans.' [Citation omitted.]"). Arceo-Rojas told Lieutenant Stopper that she and the passenger were dating and she was going to Cleveland to check it out because she might take a job there. The drive between Washington and Cleveland would take several days each direction, but the car's rental agreement was only for five days. According to Lieutenant Stopper, based on his training and experience, this kind of travel plan aligned with the tactics used by drug traffickers who "[g]enerally . . . make really short, fast trips." He explained that a short, fast trip "limits the exposure to law enforcement and possibly that they're going to get interdicted by law enforcement."

Moreover, the five-day rental agreement began in Washington on November 2, 2016, and the car stop occurred on November 4, 2016, in Geary County, Kansas. At this time, after having driven for two days, Arceo-Rojas had only traveled about one half of the way to her destination. Given the duration of the rental agreement, the location of the car stop, the lengthy distance remaining to Cleveland, and then a cross-country return trip to Washington, it is obvious that Arceo-Rojas would not have had time to spend in Cleveland.

Of course, these facts are inconsistent with Arceo-Rojas' claim that she was visiting the city to see if she wanted to take a job there. For example, generally someone deciding if they want to move cross-country for a job would spend more time than that evaluating the new place. While Lieutenant Stopper conceded that the passenger told him the rental agreement could be extended, he testified that this still contributed to reasonable suspicion because "[i]n the case of rental vehicles, generally, people will rent

23

it for the time that it's needed, because if you rent it and then extend it over the phone, generally, that actually costs more money."

Further, Arceo-Rojas' account was inconsistent with her passenger's. Arceo-Rojas testified she was going to Cleveland for a "couple days" but the passenger stated that she did not know how long they would stay in Cleveland but she had two weeks off work. Together, these inconsistencies contributed to reasonable suspicion.

The trial court also focused on the five-day term of the rental agreement given Arceo-Rojas' purported purpose in making the trip:

> "[District Judge:] And, sure, it can be extended, but if you know you're going to drive two-thirds the way across the country for work, a normal driver is just going to rent the vehicle for the time it's going to take to do that. And you can imagine, then, if you're going out there for work, you can stay there for a few days and then you're going to come back. Using the ways of the world, a five-day trip is going to, basically, mean you're going to Cleveland and almost doing an immediate U-turn so you can get back to Washington. So, a reasonable officer would have some suspicion about that.
>
> "And on top of it, the friend says, [']well, I've got two weeks off,['] which doesn't comport with the rental agreement."

We note that the dissent concedes that Arceo-Rojas and her passenger had unusual, but consistent, travel plans. That is, the dissent contends that even though the roads that Arceo-Rojas traveled to reach Cleveland were not the most direct route, Arceo-Rojas and her passenger consistently stated that they were traveling to Cleveland so Arceo-Rojas could consider a new job. Because both Arceo-Rojas and her passenger consistently stated that they were heading to Cleveland for Arceo-Rojas' potential job opportunity, the dissent asserts that Arceo-Rojas' unusual travel plans did not give Lieutenant Stopper reasonable suspicion since Lieutenant Stopper never "asked any

24

questions that would have elicited" the details of Arceo-Rojas' and her passenger's original travel plans. Slip op. at 46 (Arnold-Burger, C.J., dissenting). Thus, the dissent argues that it is irrelevant that Arceo-Rojas never mentioned that she and her passenger initially intended to travel to Utah.

Yet, Lieutenant Stopper asked Arceo-Rojas why she was so far off course with the route she was traveling to Cleveland. In her reply to Lieutenant Stopper's question, Arceo-Rojas initially blamed "her work" for advising her to take I-70 to Cleveland but then she told the officer that she was simply following the instructions from her GPS. Certainly, if Arceo-Rojas' out-of-the-way path was the result of a travel plan, changing the destination from Utah to Cleveland, Arceo-Rojas would have told Lieutenant Stopper about the change to her and her passenger's travel plans. Instead, Arceo-Rojas gave inconsistent statements, blaming her indirect route on her GPS instead of a change in travel plans.

*Masking odor*

Lieutenant Stopper also testified that he relied on a "strong fragrance coming from the interior of the vehicle" to form reasonable suspicion. He testified that he noticed a "strong odor" of either "cologne or perfume or air fresheners" when he approached the passenger side window of the car, but it "dissipated rather quickly" while he stood at the window. The trial court found "based on [Lieutenant Stopper's] training and experience, air freshener, body spray, something that you use to create a different smell in the car, is a way of masking the potential presence of the smell of drugs." Our Supreme Court has recognized that air freshener or other strong fragrances in vehicles can contribute to reasonable suspicion "because of its known use for masking drug odor." *Schooler*, 308 Kan. at 353.

25

The dissent counters that because the strong fragrance quickly dissipated that "[t]hat fact reduces the suspicion associated with a masking agent. There was no smell in the vehicle at all, not even marijuana." Slip op. at 44 (Arnold-Burger, C.J., dissenting). But the quick dissipation "meant quite a bit" to Lieutenant Stopper because it suggested that the fragrance was probably sprayed in the air. Corroborating the officer's testimony, during the subsequent search of the vehicle a container of body spray was found in the door pocket of the passenger's door.

Contrary to the dissenting view, the trial court concluded, "[b]ut you've got the air freshener that's very strong when he goes up to the door, and weakens, which suggests to a reasonable officer, that as the pullover was happening, it had been applied." It is an understatement to observe that a passenger's application of a strong fragrance inside the car's interior, knowing that a police officer will soon be in close proximity to the car's interior, is especially probative of a masking agent for illegal drugs. Lastly, the dissent's emphasis on the fact that Lieutenant Stopper failed to smell the marijuana while outside the car is easily explained given that the marijuana was found in 51 bags that were each vacuum-sealed.

*Third-party car rental*

In *DeMarco*, the trooper stated the fact that DeMarco's vehicle was rented in the name of a third party contributed to reasonable suspicion. Our Supreme Court rejected this as a factor because nothing in the record in *DeMarco* connected third-party vehicle rental with criminal activity. 263 Kan. at 741. Here, on the other hand, Lieutenant Stopper testified that the car was rented in the passenger's absent husband's name, and he found this suspicious based on his 10 years of law enforcement experience and over 300 hours of specialized training on criminal and drug interdiction. According to Lieutenant Stopper, "a lot of times [drug traffickers will] use vehicles registered or rented in somebody else's name." The passenger did tell Lieutenant Stopper that the car was rented

to her husband, whose last name matched her last name. This makes this factor slightly less suspicious, but he was nevertheless an absent third party. Moreover, adding to the questionable nature of the third-party rental, according to the passenger, her husband had rented the car for her and her girlfriend, Arceo-Rojas, who were in a dating relationship, to take a cross-country trip without him.

*The duffel bag*

Last, we note that the dissent contends that the black duffel bag in the back of Arceo-Rojas' vehicle did not create a reasonable suspicion that Arceo-Rojas was engaging in criminal activity because many people use duffel bags when traveling. Even so, the dissent overlooks the possible significance of the duffel bag to Lieutenant Stopper. In fact, Lieutenant Stopper testified that in his experience "I've made many, many, many seizures of large amounts of drugs, specifically high grade marijuana, from similar [duffel] bags." Here, Lieutenant Stopper noticed how Arceo-Rojas and her passenger had strewn clothes all around the large duffel bag in the back of the car. Thus, Arceo-Rojas and her passenger were not using the duffel bag for its traditional traveling purpose—to store clothes. As a result, this factor supports the existence of reasonable suspicion for a dog sniff.

*Conclusion*

In denying Arceo-Rojas' motion to suppress, the trial court stated:  "I only need to make a determination as to what a reasonable officer would have thought at the scene. And [I have] no doubt about Lieutenant Stopper's honesty in this issue." We are mindful of the trial court's credibility finding and the United States Supreme Court's admonition that the totality of the circumstances standard "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the

27

cumulative information available to them." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002); *Schooler*, 308 Kan. at 352.

In sum, the totality of the circumstances, including Arceo-Rojas' implausible and inconsistent travel plans, the use of a masking odor in the car, and the third-party car rental and large duffel bag, considered together gave Lieutenant Stopper grounds for reasonable suspicion of criminal activity. Thus, Lieutenant Stopper had the reasonable suspicion necessary to briefly detain Arceo-Rojas until a K-9 unit arrived for a dog sniff search of the car. Because Lieutenant Stopper had reasonable suspicion for both the initial traffic stop and the later extension of the stop, we affirm the trial court's denial of Arceo-Rojas' suppression motion.

Affirmed.

\* \* \*

ARNOLD-BURGER, C.J., dissenting: I respectfully dissent. I believe both the traffic stop of Erika Yazmin Arceo-Rojas and the search of her vehicle were unlawful. I would reverse the district court ruling to the contrary and suppress all evidence obtained after the traffic stop, at a minimum, and certainly after Arceo-Rojas was given a warning ticket and told she was free to leave. I will address each issue in order. But first I note that the only issue before us is whether the district court should have granted the motion to suppress.

We review a motion to suppress using a bifurcated standard. We review the court's factual findings for substantial competent evidence, but we review the legal conclusions drawn from those facts de novo. "Substantial competent evidence is evidence that a reasonable person could accept as being adequate to support a conclusion. We do not reweigh the evidence, access witness credibility, or resolve evidentiary conflicts.

28

[Citations omitted.]" *State v. Boggess*, 308 Kan. 821, 825, 425 P.3d 324 (2018). But when the facts are undisputed, whether the court should have suppressed the evidence is a question of law subject to de novo review. *State v. Parker*, 309 Kan. 1, 5, 430 P.3d 975 (2018). The burden is on the State to establish the lawfulness of a warrantless search and seizure. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). So, I begin with the reason for the stop.

*The stop was unlawful because there was no violation of any traffic laws.*

THE FACTS

The facts regarding the traffic stop are undisputed, mainly due to the in-car videos introduced at trial and submitted as part of the record on appeal. As a result, our review is unlimited.

Lieutenant Justin Stopper with the Geary County Sheriff's Department observed Arceo-Rojas driving a car, a Kia Sorrento with Colorado tags, in the left lane on I-70 eastbound at the 308 mile marker. The speed limit on I-70 was 75 mph. He was traveling in the opposite direction and turned around to follow her. Arceo-Rojas kept driving in the left lane with another vehicle next to her in the right lane for 3 miles, until mile marker 311. Both cars were going 74 miles per hour and at one point Arceo-Rojas dropped slightly back from the vehicle in the right lane. There was a third vehicle coming up behind Arceo-Rojas in the right lane that was going 77 mph and traveling closely behind the vehicle Arceo-Rojas was trying to pass. When the vehicle in the right lane slowed down, Arceo-Rojas passed it in the left lane. She turned on her right turn signal and moved over to the right lane about two minutes after the officer started his video camera. She was stopped by the officer at mile marker 313. Stopper testified that if Arceo-Rojas had sped up to 78 mph to pass the vehicle, he would not have stopped her for speeding.

But see *State v. Gonzalez*, 57 Kan. App. 2d 510, 511, 455 P.3d 419 (2019) (vehicle with California tags stopped for going 78 mph in a 75-mph zone).

While he was still at her passenger side car window, Stopper told Arceo-Rojas that he would issue her a warning ticket for "lingering in the left lane" in violation of K.S.A. 2016 Supp. 8-1522, but he needed her to come back to his patrol car for him to write it up. Stopper never mentioned anything to her about an unsafe lane change and did not include it in the warning ticket, although he claimed at the preliminary hearing and at the motion to suppress hearing that it was another basis for the stop. But the State abandoned that argument at trial—not discussing an unsafe lane change at all. Stopper testified at trial that the sole reason for the stop was prolonged driving in the left lane. This was a position more consistent with his actions at the time of the stop. Accordingly, any discussion of an unsafe lane change by the majority is irrelevant as it was *not* a basis for the stop according to Stopper's sworn statement at trial.

Although we are not bound by the district court's findings, the court found:

"[T]here was a reasonable and articulable suspicion that Ms. Arceo-Rojas was staying in the left lane in violation of that statute. And, yes, that is fairly normal driving activity, as Ms. Barnes said. Having the car on cruise control would cause the driver to do that. And maybe those are defenses at a trial for that traffic offense, but from the officer's prospective that day, there was a reasonable and articulable suspicion of the violation."

THE LAW

Because a traffic stop is a seizure under the Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights, a police officer may perform a traffic stop only if the officer reasonably suspects that the driver has committed, is committing, or is about to commit a crime or a traffic infraction. See *State v. Jones*, 300 Kan. 630, 637, 333 P.3d 866 (2014). In reviewing the officer's actions, we

30

must take a detached and objective view, evaluating the reason for the stop in light of the particular circumstances. "This detached review requires application of an objective standard: '[W]ould the facts available to the officer at the moment of the seizure . . . "warrant a man of reasonable caution in the belief" that the action taken was appropriate?'" 300 Kan. at 644. A traffic infraction provides an objective reason to effectuate a traffic stop. *State v. Garza*, 295 Kan. 326, 332, 286 P.3d 554 (2012).

There is no dispute about which statute served as the basis for the stop of Arceo-Rojas' vehicle.

> "Whenever any roadway has been divided into two or more clearly marked lanes for traffic, the following rules in addition to all others consistent herewith shall apply.
>
> . . . .
>
> "(c) Upon a highway located outside the corporate limits of any city divided into two lanes of traffic proceeding in the same direction, all vehicles shall be driven in the far right lane except when:
>
> (1) Overtaking and passing another vehicle;
>
> (2) preparing to make a proper left turn;
>
> (3) otherwise directed by official traffic-control devices; or
>
> (4) otherwise required by other provisions of law." K.S.A. 2016 Supp. 8-1522.

Webster's New World College Dictionary 1043 (5th ed. 2014) defines overtaking as "to catch up with and, often, go beyond." Based on the common definition, the term overtaking does not require one to pass. Passing is defined as "going by, beyond, past, over, or through." Webster's New World College Dictionary 1066 (5th ed. 2014). So although overtaking and passing are two different concepts, the statute requires both. As long as a vehicle is in the process of overtaking or passing another vehicle it can remain in the left lane. The statute does not provide a time limit for passing another vehicle. As Stopper admitted at the suppression hearing, it is not unusual for passing to take longer when drivers are using cruise control.

31

It is hard to determine when a driver's actions would violate the statute. Can a driver proceed into the left lane only if the driver intends to pass a vehicle? If so, how would the State ever prove the driver's intent? Is a driver required to pass another vehicle while in the left lane and is there a specific amount of time in which this pass must occur? Once a driver passes another vehicle, is he or she then required to move back into the right lane, or can the driver stay in the left lane in anticipation of passing a car ahead? What if a driver needs to exceed the posted speed limit in order to pass? What if a driver intended to pass but the car next to him or her increases speed? That said, a panel of this court, in an unpublished opinion, has found that K.S.A. 2016 Supp. 8-1522(c) is not unconstitutionally vague. It found that the statute "reasonably describes conduct that a person of common intelligence would understand is prohibited and does not contain terms that are confusing or susceptible to ambiguous or differing meaning." *State v. Possemoto*, No. 115,087, 2018 WL 297378, at \*5 (Kan. App. 2018) (also involving Stopper and his allegation that Possemoto was traveling in the left lane on I-70 without passing anyone for 3 miles).

So given the language of the statute, we must focus—not on whether Arceo-Rojas violated the statute beyond a reasonable doubt—but whether the facts available to the officer at the moment of the stop would warrant *a person of reasonable caution* in the belief that she violated the statute. My review of the undisputed facts, my observation of the events on the in-car video, and the language of the statute cause me to believe that a person of reasonable caution would not interpret Arceo-Rojas' driving as a violation of the statute.

Arceo-Rojas' vehicle was side-by-side with the other vehicle or slightly set off from it for the entire time Stopper observed it. That her placement in the lane seemed to irritate the driver behind her, who was speeding, is immaterial. That driver was clearly violating the law based on Stopper's radar reading. In fact, Arceo-Rojas did pass the

32

vehicle next to her and move back to the right lane before the officer initiated his enforcement action—all while maintaining the speed limit. Even the district court judge noted that Arceo-Rojas' behavior was "fairly normal driving activity" and "[h]aving the car on cruise control would cause the driver to do that."

Given the plain language of the statute—with its failure to designate a time limit on passing—and the facts here, I find it hard to believe that anyone could come to a contrary conclusion. My opinion would be different if Arceo-Rojas' vehicle was actually "hanging out" in the left lane as the deputy suggested. In other words, if there had been no cars in the right lane that were within sufficient distance to be interpreted as overtaking and passing by Arceo-Rojas. But here, she was in the process of passing, albeit over the course of 3 miles, which became obvious when she did so *before* the officer even turned on his emergency lights and moved in behind her.

And, this was not a reasonable mistake of fact or law as the State alternatively argues. Even assuming the statute was ambiguous, an officer's reasonable mistaken interpretation of an ambiguous law may still provide reasonable suspicion to detain a driver. *Heien v. North Carolina*, 574 U.S. 54, 60, 135 S. Ct. 530, 190 L. Ed. 2d 475 (2014). The United States Supreme Court explained that the "Fourth Amendment tolerates only reasonable mistakes, and those mistakes—whether of fact or law—must be objectively reasonable." 574 U.S. at 66. Moreover, "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce." 574 U.S. at 67. Similarly, the Kansas Supreme Court has found that a mistake of law may not support reasonable suspicion in certain circumstances, noting that a police officer "must be held to a more demanding standard of legal knowledge than any citizen who may be subject to the officer's exercise of authority." *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 638, 176 P.3d 938 (2008).

I agree with Arceo-Rojas' position on the language of the statute.

33

"The officer's interpretation of K.S.A. [2016 Supp.] 8-1522(c) created an allowance for the officer to determine how long was too long to stay on the left lane, when the statute clearly states that the only determination for him to make is the purpose of the driver occupying that lane. Thus, the officer here re-wrote the statute to include a temporal requirement that is not part of the unambiguous language."

Accordingly, I would find that the district court erred in denying Arceo-Rojas' motion to suppress based on an illegal stop. I would reverse the district court's decision denying the motion to suppress the evidence obtained after Stopper stopped Arceo-Rojas. There was no basis to stop her in the first place.

*The officer had no reasonable and articulable suspicion to detain Arceo-Rojas while he waited for the drug dog to arrive and circle her car.*

THE FACTS

Again, because the conversations at issue are in videos shown to the district judge and are part of the record on appeal, there can be no dispute over the facts known to the officer when he decided to detain Arceo-Rojas to await the arrival of a drug dog.

On November 4, 2016, Arceo-Rojas was the driver of a white Kia Sorrento that was rented by Jason Reidt, the husband of her passenger, Elizabeth Reidt. The car was rented in Pasco, Washington, on November 2, 2016, at 10:12 a.m. and was to be returned to Pasco, Washington, on November 7, 2016, at 10:15 a.m. The term of the rental could be extended. Stopper pulled the vehicle over for prolonged driving in the left lane. When he approached the passenger side window he smelled "[a] very strong fragrance that dissipated quickly." He could not tell if it was perfume, cologne, body mist, or air freshener. He thought it was a "female . . . oriented" smell. When he returned to the vehicle four-and-a-half minutes later to talk to Elizabeth, at the same passenger's

34

window, he did not notice the fragrance anymore. But at no point did he smell marijuana. He could also see luggage and clothes in the back seat and, in the very back cargo area, he observed what looked to him like a large black duffel bag, but he was not positive it was a duffel bag. He could only say it was a large black cloth object. Arceo-Rojas handed him a valid driver's license and the rental papers for the car, which he examined. He asked her to step back to his patrol car, which she did. The conversation was recorded on his in-car video.

> "[Stopper:]  Where you heading to?
> "[Arceo-Rojas:]  Um, Cleveland?
> "[Stopper:]  Cleveland? OK.
> "[Stopper:]  Where you coming from?
> "[Arceo-Rojas:]  Um, Washington.
> "[Stopper:]  I gotcha. OK. What takes you out to Cleveland?
> "[Arceo-Rojas:]  Well, I work for U-Haul so they are giving me . . . options for work.
> "[Stopper:]  OK.
> "[Arceo-Rojas:]  So.
> "[Stopper:]  What do you mean options for work?
> "[Arceo-Rojas:]  Like better options. They need um—I work for U-Boxing so I do— they rent—so there's a new thing, um, they get, um, boxes and let's say you want to move from let's say Washington to over there you get, um, boxes, you pack your stuff, we take the boxes to your house, you pack your stuff, and then—we ship them and stuff like that so I'm the driver.
> "[Stopper:]  Oh, OK.
> "[Arceo-Rojas:]  Yeah.
> "[Stopper:]  So what . . . actually takes you up to Cleveland?
> "[Arceo-Rojas:]  To see the—just around.
> "[Stopper:]  Oh, really?
> "[Arceo-Rojas:]  Yeah.
> "[Stopper:]  How long you gonna be up there for?
> "[Arceo-Rojas:]  Just a couple days.
> "[Stopper:]  Oh, really?
> "[Arceo-Rojas:]  [nods head up and down]

35

"[Stopper:]  Who rented the vehicle?

"[Arceo-Rojas:]  She did [pointing back to the Kia].

"[Stopper:]  She did?

"[Arceo-Rojas:]  Yeah.

"[Stopper:]  OK. What's her name?

"[Arceo-Rojas:]  Elizabeth.

"[Stopper:]  OK. So they have one of those facilities in Cleveland or?

"[Arceo-Rojas:]  Yeah.

"[Stopper:]  Do you know where it's at or?

"[Arceo-Rojas:]  Not quite, not yet.

"[Stopper:]  Are you going to move out there or?

"[Arceo-Rojas:]  Probably.

"[Stopper:]  When are you thinking of moving?

'[Arceo-Rojas:]  I don't know, in a couple months it depends, it depends on pay, you know?

"[Stopper:]  Where you staying at while you're up there?

"[Arceo-Rojas:]  What was that?

"[Stopper:]  Where are you gonna stay at while you're up there?

. . . .

"[Arceo-Rojas:]  We're looking at hotels.

. . . .

"[Stopper:]  And who's that with you?

"[Arceo-Rojas:]  Elizabeth?

"[Stopper:]  Elizabeth? OK, how do you know Elizabeth?

"[Arceo-Rojas:]  Ummm—well we met at a club. . . . She's my friend, well my girlfriend.

"[Stopper:]  OK. How long have you guys been together?

'[Arceo-Rojas:]  A year.

"[Stopper:]  A year? OK, alright cool. I am going to go ask Elizabeth a couple questions I'll be right back, OK. Hold on let me [unintelligible—he then calls in her identifying information into dispatch and asks for a Triple I criminal history check]. Alright, just hang tight I'll be right back with you, OK?

"[Arceo-Rojas:]  OK."


You can then hear Stopper's conversation with Elizabeth at the Kia:

36

"[Stopper:] Hey, Elizabeth? Can I ask you a couple questions?

"[Elizabeth:] Yeah.

"[Stopper:] Where you guys heading to?

"[Elizabeth:] Well we're [unintelligible] originally were gonna go to Utah but we're gonna go to Cleveland.

"[Stopper:] You're gonna go to Cleveland? OK, what takes you out to Cleveland?

"[Elizabeth:] Well I just want to [unintelligible] for her it's because of U-Haul.

"[Stopper:] U-Haul, OK—what are you guys gonna be doing in Cleveland though?

"[Elizabeth:] First, we are going to get jerseys.

"[Stopper:] What's that?

"[Elizabeth:] We're gonna go get jerseys, that's her favorite.

"[Stopper:] OK . . . why are you actually going to, to Cleveland, though?

"[Elizabeth:] Because we want to move, well she wanted to move.

"[Stopper:] OK . . . and you guys are thinking of Cleveland? What's in Cleveland?

"[Elizabeth:] To be honest [unintelligible].

"[Stopper:] OK [unintelligible] up there in Washington? OK. Hey, who rented the vehicle?

"[Elizabeth:] My husband.

"[Stopper:] Your husband? What's his name?

"[Elizabeth:] Jason Reidt.

"[Stopper:] OK. . . . Do you have an ID on you?

[Elizabeth shuffles papers.]

"[Stopper:] How long you guys gonna be up in Cleveland for?

"[Elizabeth:] I got two weeks off.

"[Stopper:] You got two weeks off?

"[Elizabeth:] Yeah. They told me we can rent it [unintelligible] can help me out. . . . I don't have a credit card.

"[Stopper:] OK. Alrighty, I'll go give that back to you. Alright, she'll be back up here in just a second, OK? Alright, thank you."

I pause to note that it is during the unintelligible parts of his interview with Elizabeth that Stopper fills in the blanks with his testimony. He claims that during this portion, Elizabeth informed him that they had first gone to Utah and then from Utah decided to go

to Cleveland. Elizabeth's husband rented the car because Elizabeth did not have a credit card. The rental agreement allowed them to extend the length of the rental if they needed. And Elizabeth said they would get sports jerseys in Cleveland because that is where Arceo-Rojas' favorite team was.

Stopper returns to his car where Arceo-Rojas awaits.

"[Stopper:] I'm just gonna cut you a warning ticket for the, uh, left lane violation. OK?

"[Arceo-Rojas:] Sorry about that. It's been a long drive.

"[Stopper:] Yep. How'd you guys end up on 70?

"[Arceo-Rojas:] What was that?

"[Stopper:] How did you guys end up on I-70?

"[Arceo-Rojas:] Well we did the—on the—GPS whatever.

"[Stopper:] Um hum.

"[Arceo-Rojas:] But then at work they give me directions and I'm not really good with, um, the directions stuff, so we just, um, I don't know, from the GPS.

"[Stopper:] OK. Yeah, it probably would have been a whole lot . . . faster to actually go down 80.

"[Arceo-Rojas:] Oh, really?

"[Stopper:] Oh, yeah, yeah, it probably would have been a whole lot faster.

"[Arceo-Rojas:] Like a big difference?

"[Stopper:] Yeah, probably. So . . . have you talked to them about working out there or are you just gonna kind of see what it's, what it's about?

"[Arceo-Rojas:] Well the thing is that if I move over here they're thinking about giving me a raise and a better position but I don't know if I want to leave my family, you know, behind and stuff.

"[Stopper:] I gotcha.

"[Arceo-Rojas:] My mom and—but I don't know. They told me to come and check it out. Um, we'll see. And . . . in Washington I already have my customers—I don't know just.

"[Stopper:] Do you still live on Pearl Street?

"[Arceo-Rojas:] Yeah.

"[Stopper:] OK. Where is . . . Pasco, Washington? Where's that located at?

"[Arceo-Rojas:] It's tri-cities. Um, we're close to Oregon. It's really close to.

38

"[Stopper:]  OK.

"[Arceo-Rojas:]  Oregon [unintelligible]. You never heard of that? . . .

"[Stopper:]  No, actually I haven't.

"[Arceo-Rojas:]  There's like three cities, like close, like minutes away.

"[Stopper:]  You know what year that is by any chance?

"[Arceo-Rojas:]  Uh, 16, I believe.

"[Stopper:]  OK. So, uh, how did you hear about, um, Cleveland?

"[Arceo-Rojas:]  Work.

"[Stopper:]  Work?

"[Arceo-Rojas:]  Actually, we were just talking about it that [because] I'm a if this sounds
. . . I'm a fan of the Cavaliers.

"[Stopper:]  Mhmm.

"[Arceo-Rojas:]  And I just realized that we're going to—

"[Stopper:]  [talking on radio] 4-0-6 go ahead.

"[Arceo-Rojas:]  Do you guys get to use the same car all the time or do you share cars?

"[Stopper:]  [This] is my take home car so I have it all the time, it's mine pretty much, so.

"[Arceo-Rojas:]  [unintelligible, nods]

"[Stopper:]  [typing on his laptop] Yeah, see it actually says [Arceo-Rojas leans in to look
at screen] on here like . . . 90 would have been the fastest . . . 90 and then 80 and then . . . .

"[Arceo-Rojas:]  [unintelligible]

"[Stopper:]  Hold on just a second [talking on the radio] 4-0-6 go ahead. 10-4, unit 52 for
62788."

Stopper testified at trial that he thought it was important to show Arceo-Rojas how far off
course she was so that when they went back to Washington they wouldn't make the same
mistake. His stated reason for reviewing the map would indicate he was going to release
her, because otherwise there would be no "return trip" to worry about. After seemingly
signing off with dispatch regarding the stop, the following conversation took place:

"[Stopper:]  Alrighty, well I will go ahead and give this to you. It's . . . just a warning.
Make sure like I said, um, I just noticed you were there for several miles and I know that
vehicle behind you was trying to get around you and go by you and stuff . . . . Make sure

39

. . . basically think of it as like a passing lane only so if you're not passing somebody . . . basically if you have no reason to be in the left lane just hang out in the right lane, OK.

"[Arceo-Rojas:]  OK.

"[Stopper:]  But it's just a warning citation so . . . I'll give that to you. . . . Here's your license and your rental agreement. Here's the envelope that the rental agreement came in, so.

"[Arceo-Rojas:]  OK, perfect.

"[Stopper:]  Alrighty.

"[Arceo-Rojas:]  Thank you.

"[Stopper:]  Alrighty, take care.

"[Arceo-Rojas:]  Yeah, you too."

Arceo-Rojas exits the patrol car with her papers and as she is shutting the door, the officer calls out to her.

"[Stopper:]  Miss Arceo? Can I ask you a couple questions?

"[Arceo-Rojas:]  What was that?

"[Stopper:]  Can I ask you a couple questions?

"[Arceo-Rojas:]  [nods affirmatively]

"[Stopper:]  We've got a problem with people transporting illegal items up and down the highway, guns and drugs and stuff like that.

"[Arceo-Rojas:]  OK.

"[Stopper:]  Do you have anything illegal in your car?

"[Arceo-Rojas:]  No.

"[Stopper:]  Any guns or drugs or weapons?

"[Arceo-Rojas:]  No, no.

"[Stopper:]  Can I search your vehicle?

"[Arceo-Rojas:]  What was that?

"[Stopper:]  Can I search your car?

"[Arceo-Rojas:]  Do you, can . . . you do that?

"[Stopper:]  I can ask.

"[Arceo-Rojas:]  Well, unless you can. I mean [shaking head no].

"[Stopper:]  Well, I'm . . . just asking, I mean, can I search your vehicle?

40

"[Arceo-Rojas:] Well can you—do you—have the right to search it right now?

"[Stopper:] Well, it's up to you.

"[Arceo-Rojas:] I'm just asking [about] my rights, you know.

"[Stopper:] Well, you have the right to tell me 'no.'

"[Arceo-Rojas:] OK well, I would appreciate if you not.

"[Stopper:] OK. Would you mind if I have my, uh, canine partner come out here and run his dog around it?

"[Arceo-Rojas:] Why?

"[Stopper:] Because . . . I suspect you guys are involved in some criminal activity and I'm just wondering if you would mind waiting for my dog, my dog to get here?

"[Arceo-Rojas:] That's, those are not, I mean . . . like my rights and stuff, I would think.

"[Stopper:] OK, well, um, so I'm gonna detain you until the dog gets here and runs around your vehicle, OK? OK? So.

"[Arceo-Rojas:] Can I talk to her? [motioning to Elizabeth in the rental car]

"[Stopper:] No, not right now, OK? Um, just hang tight for me, OK?"

Stopper then calls the canine officer to bring the drug dog to the scene as Arceo-Rojas stands outside the car with the door open. She leans back in.

"[Arceo-Rojas:] So, um, just a question.

"[Stopper:] Yeah.

"[Arceo-Rojas:] So if you stopped me for that [referring to her warning ticket] why am I retained for something else?

"[Stopper:] Because . . . I'm investigating another crime right now.

"[Arceo-Rojas:] But why? You can stop me another reason.

"[Stopper:] Because that's what I do for a living. I'm a police officer. I'm supposed to recognize criminal activity.

"[Arceo-Rojas:] OK, so . . .

"[Stopper:] A simple traffic infraction on many times of what I do, this is all I do . . . a simple traffic infraction leads to major seizures of drugs, or weapons, or guns or murderers or kidnappers and other stuff like that so. And based on the totality of the circumstances . . .

"[Arceo-Rojas:] Huh?

41

"[Stopper:] And based on the totality of the circumstances after talking to you, what I've seen in the vehicle, what I've, um, heard from [each of] you guys, I suspected criminal activity might be afoot and so that's why I'm calling out the dogs, OK?"

As properly summarized by the majority:

"Lieutenant Stopper decided to detain Arceo-Rojas until the K-9 unit arrived. Lieutenant Stopper stated that he decided to detain Arceo-Rojas because of the totality of the circumstances, including

"'the heavy odor coming from the vehicle, the travel plans stated by the occupants, basically the disparity in travel plans, the large black duffel bag—that was part of it, not a whole lot of it, but that was a part of it—the extreme off route that they were in, the obvious signs of stress that they were exhibiting.'" Slip op. at 8.

The district court denied Arceo-Rojas' motion to suppress and found that (1) the odor of body spray coming from the vehicle after the window was rolled down; (2) a third-party rental; (3) the strange route from Washington to Cleveland—along with a rental agreement too short in length to accommodate such a trip; and (4) the observation of a black bag that could contain contraband, were supported by the testimony and were sufficient to establish reasonable suspicion to extend the stop for the drug dog to arrive and walk around the vehicle. The court discounted any of the officer's testimony about nervousness on the part of the driver or passenger as unsupported by the evidence. The video simply did not reflect the extreme nervousness that the officer claimed Arceo-Rojas and the passenger displayed. Although mentioned in the majority's recitation of the facts, the district court also did not give any credence to the testimony of Stopper about "auditory exclusion"—an indicator, according to Stopper, of a "fight or flight" response. Stopper suggested that this caused Arceo-Rojas to be deaf to the blinker and so she did not turn it off after she pulled off to the side of the road.

42

On appeal, Arceo-Rojas does not contend that the questioning about her travel plans unnecessarily prolonged the stop. Instead, she argues that once the traffic stop ended, Stopper had no reasonable and articulable suspicion to justify detaining her pending the appearance of the drug dog.

An officer may expand the investigative detention beyond the duration necessary to fulfill the purpose of the initial stop only if there is an objectively reasonable and articulable suspicion that criminal activity was or is taking place. *State v. Jones*, 300 Kan. 630, 641, 333 P.3d 886 (2014). The United States Supreme Court has explained that the State does not meet its burden by simply proving that the officer believed the circumstances were sufficient to form a reasonable suspicion. Rather, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). "Something more than an unparticularized suspicion or hunch must be articulated." *State v. DeMarco*, 263 Kan. 727, 735, 952 P.2d 1276 (1998). Our Supreme Court recently pointed out that what is reasonable depends on the totality of the circumstances in the view of a trained police officer. *State v. Schooler*, 308 Kan. 333, 352, 419 P.3d 1164 (2018). Moreover,

> "'The relevant inquiry is not whether particular conduct is "innocent" or "guilty," but whether a sufficient degree of suspicion attaches to particular types of noncriminal acts. [Citation omitted.] The totality of the circumstances standard precludes a "divide-and-conquer analysis" under which factors that are "readily susceptible to an innocent explanation [are] entitled to 'no weight.'" [Citations omitted.]'" *State v. Sharp*, 305 Kan. 1076, 1081-82, 390 P.3d 542 (2017).

While neither officers nor the courts can selectively choose the facts that would establish reasonable suspicion, "events and conditions giving rise to reasonable suspicion are fluid

rather than fixed, and the existence of reasonable suspicion may change once new facts are observed by or become known to law enforcement." 305 Kan. at 1085.

The State relies on the four factors cited by the district court in support of a finding that Stopper had a reasonable suspicion of criminal activity to support detaining Arceo-Rojas until the drug dog arrived. As does the State and the majority, I will focus on the sufficiency of those four items, reviewed together, in considering the continued detention of Arceo-Rojas.

a. *The masking agent*

"Air freshener odor in a rented vehicle has been held to contribute to reasonable suspicion because of its known use for masking drug odor." *Schooler*, 308 Kan. at 353. The district court found that "based on [Stopper's] training and experience, air freshener, body spray, something that you use to create a different smell in the car, is a way of masking the potential presence of the smell of drugs." That it was strong at first and then dissipated "suggests to a reasonable officer, that as the pullover was happening, it had been applied."

But in looking at the totality of the circumstances, the district court does not mention that just four-and-a-half minutes later, when Stopper returns to the same window, there is no masking agent smell. That fact reduces the suspicion associated with a masking agent. There was no smell in the vehicle at all, not even marijuana. So there was apparently no smell to mask. Just as our Supreme Court stated in *Sharp*, "events and conditions giving rise to reasonable suspicion are fluid rather than fixed, and the existence of reasonable suspicion may change once new facts are observed by or become known to law enforcement." 305 Kan. at 1085. The new fact was that no masking odor was detectable just a short time later. This would suggest that there was no static item in the vehicle, like an air freshener or dryer sheets, masking the smell. See *State v. Moore*,

44

283 Kan. 344, 359, 154 P.3d 1 (2007) (car containing *little* clothing during a trip across the country, coupled with the odor of dryer sheets in the car, increases the possibility of reasonable suspicion); *Charity v. State*, 132 Md. App. 598, 631, 753 A.2d 556 (2000) (odor of a large quantity of air fresheners contributed to officer's "strong hunch" of drug related activity, but did not raise an articulable suspicion, even when combined with other factors); *State v. Malone*, 274 Wis. 2d 540, 562, 683 N.W.2d 1 (2004) ("The presence of *seven or eight* air fresheners in a vehicle occupied by three young men with an average age of 21 does not provide probable cause for the search of a vehicle, but it certainly raises suspicion and justifies reasonable inquiry." [Emphasis added.]).

And without a long-acting masking agent, there was no smell of marijuana in the car, further diminishing the suspicions of a reasonable officer. This factor does not support an officer's reasonable suspicion; instead, it detracts from it.

### b. *Third-party rental*

The trial court found that the fact that the vehicle was rented by a third party (not either of the occupants) was a factor to support reasonable suspicion. But the judge also found that because this was rented by the passenger's husband it was not typical to the officer's profile, so the suspicion was less. In fact, the judge said it was a "minor" factor. To take that one step further, even Stopper testified that once he found out the renter was the passenger's husband, his suspicion was reduced. See *Demarco*, 263 Kan. at 740 (Kansas officer testified that fact driver was driving a rental car was an indicator but "'not that important.'").

### c. *Inconsistent and implausible travel plans*

The district judge described this as the "bigger" issue. He noted that traveling from Washington to Cleveland on I-70 was significantly out of the way. The explanation that

Arceo-Rojas' work and her GPS sent her that way was implausible. It was also implausible that they would not rent the car for enough time to spend some time in Cleveland. The discussion about first going to Utah was only shared by the passenger, so the court viewed that as inconsistent. The judge also could not understand why the parties would go to Cleveland for the sports team.

Discrepancies in travel plans have been used as objective reasonable suspicion factors in other cases, depending on the nature of the discrepancy. *Schooler*, 308 Kan. at 354. Things such as internally inconsistent statements as well as inconsistencies between the driver and passenger over travel plans have provided the basis for detention. But as the Tenth Circuit has noted, there is a difference between unusual travel plans, which do not contribute to reasonable suspicion, and "bizarre, inconsistent and evasive" ones, which do. *United States v. Simpson*, 609 F.3d 1140, 1151 (10th Cir. 2010). The court explained the distinction:

> "We have credited inconsistent travel plans as a factor contributing to reasonable suspicion when there are lies or inconsistencies in the detainee's description of them. For example, a police officer could reasonably believe a travel plan was implausible—and the person was lying—if that person claimed that he or she had left a certain city by car an hour ago if the officer pulled over that person, 200 miles from the city. To this extent, the factor seems noncontroversial: lies, evasions or inconsistencies about any subject while being detained may contribute to reasonable suspicion. In contrast, this circuit has been reluctant to deem travel plans implausible—and hence a factor supporting reasonable suspicion—where the plan is simply unusual or strange because it indicates a choice that the typical person, or the officer, would not make." 609 F.3d at 1148-49.

I submit that is exactly what we have here. There were no obvious lies in any comments made by Arceo-Rojas or Reidt. Reidt mentioned they had first gone to Utah, but Arceo-Rojas was not asked any questions that would have elicited that detail. Their stories were not inconsistent, in fact they were amazingly consistent. They both said—

46

independently—that they were going to Cleveland to check it out because Arceo-Rojas' employer, U-Haul, may allow her to transfer there for more money. That was the explanation both had for the trip. They both conveyed that Arceo-Rojas' favorite team was the Cavaliers and Reidt said they may pick up jerseys while they were there. I find nothing in the discussion that suggested they were going to Cleveland for the sole purpose of buying jerseys. This was a factual error by the district court and a misrepresentation of the facts by the State.

They were taking a route that was not the fastest—a route the typical person or the officer would not take. Arceo-Rojas appeared surprised she was on the wrong route. This is nothing like the cases that our Supreme Court pointed out in *Schooler* that *would* support a finding of reasonable suspicion based on travel plans.

"Compare *Simpson,* 609 F.3d at 1152-53 (travel plans contributed to reasonable suspicion when defendant claimed he drove from Nebraska to Reno, Nevada, just to spend one night there playing '21' at his friend's house, but despite the trip's great length and short duration, the defendant could not say when he left and when he planned to return), and *United States v. Santos*, 403 F.3d 1120 (10th Cir. 2005) (travel plans suggested criminal activity when driver [1] gave the officer multiple versions about the length of his intended stay at his destination, [2] was inconsistent about details such as whether a person he intended to visit was his sister or half-sister, and [3] was unable to recall his mother's telephone number or the ages of his sister's children, because confusion about details often indicates story is being fabricated), with *United States v. Wood*, 106 F.3d 942, 944 (10th Cir. 1997) (travel plans did not suggest criminal activity when unemployed driver [1] claimed to be on six-week vacation; [2] told officer he rented car in San Francisco instead of Sacramento, but corrected mistake when confronted with it; and [3] despite rental agreement reflecting car due back in Sacramento, explained that rental company was aware of his plans to use car for one-way travel)." *Schooler*, 308 Kan. at 354-55.

I do not believe Arceo-Rojas' travel plans here were so out of the realm of belief as to be the biggest factor or even a factor in the reasonable suspicion calculus. Nor do any perceived discrepancies rise to the level demanded by our caselaw to support reasonable and articulable suspicion of a crime based on travel plans.

### d. The duffel bag

The district court found that the duffel bag in the back of the Kia, which could hold drugs, is a "minor" factor in the calculus, but a factor. Stopper testified that he "made many, many, many seizures of large amounts of drugs, specifically high-grade marijuana, from similar [duffel] bags." So he believed this bag could have contained drugs. But a black duffel bag is also a common bag carried by travelers. In fact, the lack of luggage is more likely used as a basis to stop than too much luggage. See *United States v. Wisniewski*, 358 F. Supp. 2d 1074, 1092 (D. Utah 2005) (very little luggage in the automobile given the stated purpose of the trip), *aff'd* 192 Fed. Appx. 749 (10th Cir. 2006) (unpublished opinion); see also *United States v. Jones*, 44 F.3d 860, 872 (10th Cir. 1995) (noting that "the lack of luggage for an alleged two week trip" was a factor supporting a reasonable suspicion finding); *United States v. Pulido-Vasquez*, 311 Fed. Appx. 140, 145 (10th Cir. 2009) (unpublished opinion) (lack of luggage even though two men claimed to be taking an overnight trip was a factor suggesting illegal activity). A small gym bag, as opposed to the large black duffel bag here, has been the basis for officers to suspect drugs in other cases. See *United States v. Correa*, 641 F.3d 961, 964 (8th Cir. 2011) (small gym bag which officer considered too small for the trip described).

The conclusion that because he has stopped many cars with black duffel bags that contained drugs so he had reason to believe all black duffel bags contain drugs highlights an inherent problem with officer testimony regarding drug cues that I would be remiss if I did not address.

Stopper testified to many things based on his extensive and specialized training in "criminal and drug interdiction." In determining what cues he looks at to determine whether "criminal activity [is] afoot," Stopper testified that "[t]he list is endless, as far as the indicators of criminal activity, if you will." This response—and his testimony that he has seized lots of drugs in black duffel bags—highlights the problem with the introduction of and the overreliance on profiles of drug courier activity. Although Stopper's experience and training may inform him how drug couriers transport their product and illicit gain across the country, it does not present that information as a hit rate. In other words, we may know that drug couriers show lots of behaviors enumerated and grouped into the profile, but we have no idea how many people Stopper has stopped (or collective officers nationwide have stopped) that also exhibited the same behaviors but were *not* drug couriers. Those are the victims of profiling. There is simply no data to show how often the profiles are right versus how often they are wrong. It is hardly different than saying, "all cars I have stopped with drugs have four tires, this car has four tires, therefore it must contain drugs." Without testimony or facts to support how often this fact or combination of facts results in a legal drug seizure and how often it does not, it has little meaning and is prone to arbitrary application.

This phenomenon has long been discussed in legal literature and caselaw.

"Federal agents have asserted all of the following traits as parts of a drug-courier profile:
- arrived late at night
- arrived early in the morning
- arrived in afternoon
- one of first to deplane
- one of last to deplane
- deplaned in the middle
- purchased ticket at airport
- made reservation on short notice
- bought coach ticket

49

- bought first-class ticket
- used one-way ticket
- used round-trip ticket
- paid for ticket with cash
- paid for ticket with small denomination currency
- paid for ticket with large denomination currency
- made local telephone call after deplaning
- made long-distance telephone call after deplaning
- pretended to make telephone call
- traveled from New York to Los Angeles
- traveled to Houston
- carried no luggage
- carried brand-new luggage
- carried a small bag
- carried a medium-sized bag
- carried two bulky garment bags
- carried two heavy suitcases
- carried four pieces of luggage
- overly protective of luggage
- disassociated self from luggage
- traveled alone
- traveled with a companion
- acted too nervous
- acted too calm
- made eye contact with officer
- avoided making eye contact with officer
- wore expensive clothing and gold jewelry
- dressed casually
- went to restroom after deplaning
- walked quickly through airport
- walked slowly through airport
- walked aimlessly through airport
- left airport by taxi

- left airport by limousine
- left airport by private car
- left airport by hotel courtesy van
- suspect was Hispanic
- suspect was black female

> "Needless to say, it would be extremely difficult for anybody *not* to come within such a profile." Cole, No Equal Justice: Race and Class in the American Criminal Justice System 47-49 (1999) (citing Fluid Drug Courier Profiles See Everyone as Suspicious, 5 Crim. Prac. Man. (BNA) 333-35 [July 10, 1991]).

See also Becton, *The Drug Courier Profile: "All Seems Infected That Th' Infected Spy, As All Looks Yellow to the Jaundic'd Eye,"* 65 N.C. L. Rev. 417, 439-44 (1987) (listing and discussing drug courier profile characteristics from reported decisions). United States Supreme Court Justices Thurgood Marshall and William Brennan pointed out the problems with relying on these profiles in their dissent in *United States v. Sokolow*, 490 U.S. 1, 13, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989):

> "Reflexive reliance on a profile of drug courier characteristics runs a far greater risk than does ordinary, case-by-case police work of subjecting innocent individuals to unwarranted police harassment and detention. This risk is enhanced by the profile's 'chameleon-like way of adapting to any particular set of observations.'"

See also *State v. Chapman*, 23 Kan. App. 2d 999, 1010, 939 P.2d 950 (1997) ("The point is not that drug traffickers will often exhibit such behavior, but that many innocent motorists exhibit precisely the same behavior."). Just as Stopper said, the list of indicators of criminal activity is indeed endless. And, there seems to be no agreement on how many indicators are necessary to put a driver into the drug courier category. One or two? Three or four? It seems to vary per case and again opens the door to arbitrary or even discriminatory application.

Two other issues bear mentioning. Although we are not bound by the district judge's conclusions given the undisputed facts, I agree with the district judge that any reliance on the part of Stopper on nervousness was simply not supported by the evidence. Behavioral indications of nervousness are not at all apparent on the video. In fact, Arceo-Rojas appears calm given the circumstances. Likewise, Stopper testified about the "auditory exclusion" effect without any foundation or expert testimony about its acceptance in the scientific community or its applicability in this situation. It was proper for the district court to exclude it from the reasonable suspicion determination.

I recognize that the United States Supreme Court has cautioned against a "divide-and-conquer" approach in evaluating the totality of the circumstances. See *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002) (rejecting appellate court's evaluation of disparate facts in isolation from each other in deciding whether reasonable suspicion existed). I agree that the relevant question is not whether each fact taken in isolation may have an innocent explanation, but whether the facts as a whole support the finding. But *none* of the four factors relied on by the district court support a finding of reasonable suspicion either together or separately. There was insufficient evidence to support the district court's legal conclusion.

> "Reliance on the mantra 'the totality of the circumstances' cannot metamorphose these facts into reasonable suspicion. Although the nature of the totality of the circumstances test makes it possible for individually innocuous factors to add up to reasonable suspicion, it is 'impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.'" *United States v. Wood*, 106 F.3d 942, 948 (10th Cir. 1997) (citing *Karnes v. Skrutski*, 62 F.3d 485, 496 [3d Cir. 1995]).

Although that ends the inquiry, the lack of reasonable suspicion is further bolstered when we look at the various cues that have been propounded by Kansas officers—all professing to be highly trained in drug interdiction techniques. If the

following *nonexclusive* list of items are indicators of drug trafficking, certainly their absence must weigh in favor of the driver. A court cannot arrive at probable cause simply by piling hunch upon hunch. "[I]n determining whether probable cause to arrest existed, we look not only to the facts supporting probable cause, but also to those that militate against it." *United States v. Valenzuela*, 365 F.3d 892, 897 (10th Cir. 2004). Note, not all of these have been accepted as valid factors by Kansas courts but are simply factors that Kansas law enforcement officers—who have testified that they are highly trained in drug interdiction cues—have indicated are factors that point to drug trafficking.

1. Arceo-Rojas had no criminal history of concern to the officer. If there was, he would have stated it as part of his detention calculus as he did in *Schooler*. 308 Kan. at 340.

2. She did everything requested of her. Her driver's license and rental agreement were in order.

3. Stopper did not see any "burner" phones—also associated with drug trafficking—as he did in *State v. Westmoreland*, No. 117,833, 2018 WL 3198410, at *2 (Kan. App. 2018) (unpublished opinion).

4. Stopper did not note any "visibl[e] shaking" as he did in *State v. Crudo*, No. 112,805, 2015 WL 7162274, at *2 (Kan. App. 2015) (unpublished opinion).

5. Apparently, there was more than one key on Arceo-Rojas' key ring. Stopper has testified in the past that having only one key on a key ring is an indicator that the person may be transporting drugs. *United States v. Acevedo*, No. 16-40109-DDC, 2017 WL 3437690, at *2 (D. Kan. 2017) (unpublished opinion).

6. There were not multiple cell phones or two-way radios observed in the vehicle, a factor that Kansas officers have used to support reasonable suspicion. *Schooler*, 308 Kan. 355-56; *State ex rel. Geary County Sheriff v. Milla*, No. 120,325, 2019 WL 6796205, at *7 (Kan. App. 2019) (unpublished opinion) (officer testified that "two way radios are commonly used by drug traffickers as they will employ a second vehicle that is either a load vehicle,

53

meaning it is loaded with drugs and/or large amounts of U.S. currency, or the second vehicle is an escort/decoy vehicle, which is meant to attract the attention of law enforcement to allow the load vehicle to pass unhindered").

7. There were no trash bags in the vehicle, which officers in Kansas have also said indicate drugs are present. See *Milla*, 2019 WL 6796205, at \*7 (officer testified that he saw, in the car, a "box of trash bags, which are commonly used to wrap drugs/drug proceeds").

8. Arceo-Rojas did *not* have a radar detector in the car. Kansas officers have testified that it is suspicious to have a radar detector in the car when the driver is not speeding. *State v. Arrizabalaga*, 57 Kan. App. 2d 79, 81, 447 P.3d 391 (2019).

9. There was no odor of marijuana. *State v. MacDonald*, 253 Kan. 320, 324, 856 P.2d 116 (1993) (odor of marijuana coming from vehicle provides both reasonable suspicion and probable cause for a search of the vehicle).

10. There was no odor of dryer sheets. *State v. Moore*, 34 Kan. App. 2d 795, 796, 124 P.3d 1054 (2005) (even faint odor of dryer sheets is suspicious because dryer sheets commonly used to mask odor of marijuana).

11. Neither Arceo-Rojas nor her passenger were looking straight ahead and avoiding eye contact with the deputy. *State v. Morlock*, 289 Kan. 980, 982, 218 P.3d 801 (2009) (passenger's failure to make eye contact was suspicious).

12. Arceo-Rojas was not fidgety. *DeMarco*, 263 Kan. at 735 (driver was fidgety and could not sit still—a listed factor in suspecting drugs were in car).

13. Arceo-Rojas was not coming from or going to a city defined as a major source city for drugs. *Demarco*, 263 Kan. at 730 (coming from a major source city for drugs, like Los Angeles, is part of the drug runner profile).

14. There were no hotel business cards on the floorboard of the car with handwritten numbers. *Chapman*, 23 Kan. App. 2d at 1010 (officer testified

that hotel business card with handwritten number on it was suspicious because it mirrored drug transportation procedures).

15. There were no clear plastic baggies or any portion thereof inside the vehicle. See *State v. Jones*, 47 Kan. App. 2d 866, 874-75, 280 P.3d 824 (2012) (officer testified that the observation of a corner of an empty plastic sandwich baggy supported a reasonable suspicion that vehicle was transporting drugs), *aff'd* 300 Kan. 630, 333 P.3d 886 (2014).

16. Arceo-Rojas was not traveling in a third-person's vehicle that had recently been purchased, licensed, and properly insured. See *State v. Lowery*, 308 Kan. 359, 362-63, 420 P.3d 456 (2018) (unclear why traveling in a third-person's vehicle that had recently been purchased, licensed, and properly insured raised suspicions, but according to the specially trained officer it did).

17. Her rental agreement was not expired. *State v. Coleman*, 292 Kan. 813, 816, 257 P.3d 320 (2011) (fact that rental agreement had expired two days earlier part of reasonable suspicion consideration).

18. She was not driving a particularly large car with lots of trunk capacity. See *United States v. Salzano*, 158 F.3d 1107, 1112 (10th Cir. 1998) (Kansas officers asserted that large motor homes have been used by drug runners to haul large quantities of drugs).

19. There was no discrepancy between the number of people in the vehicle and the number the rental agreement stated would be traveling. 158 F.3d at 1113.

20. Nor was there a Christmas wreath in the vehicle a few days before Christmas, another nefarious sign of drug trafficking. 158 F.3d at 1114.

21. Both Arceo-Rojas and Reidt apparently looked their ages. See *United States v. Garcia*, 52 F. Supp. 2d 1239, 1250 (D. Kan. 1999) (listed basis for reasonable suspicion was that Garcia's wife did not appear to be the age that Garcia indicated).

22. There was not a Bible in plain view on the dashboard which Kansas officers have testified is a cue because it is intended to deflect from suspicion of any

55

wrongdoing by the occupants of the vehicle. *United States v. Esquivel-Rios*, No. 10-40060-JAR, 2011 WL 1882452, at *1 (D. Kan. 2011) (unpublished opinion).

23. Nor was there religious paraphernalia on the gear shift, another indication of drug trafficking. *United States v. Guerrero*, 472 F.3d 784, 785 (10th Cir. 2007).

24. Not only was Stopper following Arceo-Rojas' car, but there was a stationary officer she passed as well. Kansas officers have testified that it is suspicious if a driver does not wave at an officer in his or her stationary vehicle while driving by the officer at 78 mph in a 75-mph zone. *Gonzalez*, 57 Kan. App. 2d at 511. There is no indication here whether Arceo-Rojas waved or not, but then she wasn't speeding.

25. Highly trained Kansas officers have even testified—albeit unsuccessfully—that fast food wrappers and open maps in the passenger compartment contributed to a finding that reasonable suspicion existed to search a car for contraband. See *United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997). There were no maps or wrappers in Arceo-Rojas' car.

26. But the lack of trash and maps is not always a plus because Kansas officers—in fact the same officer who testified food wrappers were an indicator of drug trafficking—have also testified that a clean car without luggage in the passenger compartment is an indication of drug activity. *Chapman*, 23 Kan. App. 2d at 1010. Arceo-Rojas had a clean car with luggage in the passenger compartment, but it was the fact she had what appeared to perhaps be a black duffel bag that drew her into the web of known drug traffickers.

The list of items *not* present in this case that are linked to highway drug trafficking is also endless. I hazard to guess that if nationwide testimony is examined—rather than just Kansas testimony as I have done here—it will mirror the same type of contradictory list of drug trafficking cues as discussed earlier in the age of airport drug couriers. As Justice

Marshall noted, in Kansas as elsewhere, the profiles have a "'chameleon-like way of adapting to any particular set of observations.'" *Sokolow*, 490 U.S. at 13 (Marshall, J., dissenting).

Finally, Stopper told Arceo-Rojas she was free to leave. This turned out to be a cruel trick—if one is to believe Stopper that he felt he had reasonable suspicion to continue to detain her at that point. He claims he had no intention to let her go. This is not withstanding his testimony that he showed her a map so that when Arceo-Rojas and her passenger went back to Washington, they wouldn't make the same mistake. This necessarily assumes at that point he believed they would be allowed to proceed to Cleveland and then return to Washington.

The Supreme Court was clear in *Schooler* that the "good to go" statement made by Stopper here and in *Schooler* is legally irrelevant in deciding whether an officer has an objectively reasonable suspicion that a driver is engaged in criminal activity other than the traffic infraction. 308 Kan. at 351. We are not to conclude that her release signaled there was no longer any reason to detain her and we are bound by that decision. *Ponds v. State*, 56 Kan. App. 2d 743, 753-54, 437 P.3d 85 (2019) ("This court is duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position.").

But I firmly stand with Justice Rosen, Justice Beier, and Justice Johnson in Justice Rosen's concurrence in *Schooler* on the danger of "using the promise of freedom" to circumvent a driver's constitutional rights. 308 Kan. at 357.

> "I write separately to express my doubt that the Fourth or Fifth Amendments to the
> United States Constitution permit law enforcement officers to dangle liberty in front of
> someone like a carrot in an attempt to secure justification for the violation of individual
> constitutional rights. . . . [T]here should be no doubt that constitutional concerns arise

57

when a detained traveler on the roadway is purposely misinformed that the basis for the detention is no longer in place and as a result the traveler is free to leave.

"'You are free to go,' or anything resembling it, is a special and significant declaration. It informs a person that his or her right to freedom is once again fully intact. When used as an investigatory ploy, it undermines the significance of the liberty interest it is intended to effectuate. This is especially true when the agent of the government entrusted with the power to detain is the one proclaiming the detention is no longer in force. Deputy Justin Stopper's investigatory tactics here are a threat to the integrity of an individual's right to be free from unreasonable search or seizure and the privilege against compelled self-incrimination. The specific technique of telling Schooler he was free to leave when he had no intention of letting Schooler depart reeks of fraud or coercion. . . . I would caution our law enforcement officers against using the promise of freedom in any attempt to circumvent the protections afforded by our Constitution." *Schooler*, 308 Kan. 356-57 (Rosen, J., concurring).

In conclusion, the facts set forth by Stopper as the basis for his suspicion of criminal activity on the part of Arceo-Rojas and her passenger, and upon which the district court relied, simply do not rise to the level—either individually or collectively—necessary to justify the continued detention of Arceo-Rojas. When looking at the totality of the circumstances, we must consider the quantity and quality of the evidence when evaluating whether there is reasonable suspicion. *DeMarco*, 263 Kan. at 735. Both the quantity and quality are lacking here.

Stopper had a hunch. One that proved to be correct. But it was no more than a hunch. I would reverse the district court decision denying the motion to suppress the evidence obtained after Stopper handed Arceo-Rojas a warning ticket and allowed her to leave. There was no further basis to detain her.