No. 127,617

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JOSIAH DESMOND WILLIAMS,
*Appellant*.

SYLLABUS BY THE COURT

1.

The "hemp products" exception to the definition of Tetrahydrocannabinols (THC) as a Schedule I controlled substance under the Uniform Controlled Substances Act does not apply to any "liquids, solids or gases . . . for use in vaporizing devices" that contain THC, even in an amount less than 0.3%. See K.S.A. 21-5706(b)(7); K.S.A. 2021 Supp. 65-4105(h); K.S.A. 2-3901(b)(4); K.S.A. 2-3908(a)(1)(E).

2.

When a defendant is charged with unlawful possession of THC pursuant to K.S.A. 21-5706(b)(7), with THC defined as a Schedule I controlled substance under K.S.A. 2021 Supp. 65-4105(h), the State is not required to prove that the THC did not meet an exception to the definition of THC as a Schedule I controlled substance in the Commercial Industrial Hemp Act under K.S.A. 2-3901 or K.S.A. 2-3908.

Appeal from Johnson District Court; MICHAEL P. JOYCE, judge. Oral argument held October 14, 2025. Opinion filed May 15, 2026. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

1

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before HURST, P.J., GARDNER and BOLTON FLEMING, JJ.

HURST, J.:  The State charged Josiah Desmond Williams with one count of possession of a controlled substance after having two prior convictions for a liquid cartridge that contained tetrahydrocannabinol (THC), and one count of possession of drug paraphernalia based on evidence discovered in his car after a routine traffic stop. Williams moved to suppress the evidence alleging the sheriff's deputy unlawfully extended the traffic stop. After a hearing, the district court denied the motion.

A jury found Williams guilty of both offenses, and Williams now appeals, arguing three issues. First, Williams contends that the district court erred in denying his suppression motion and, second, Williams challenges the sufficiency of the evidence by claiming the State failed to prove that the THC did not meet an exception to the statute prohibiting the possession of THC. Relatedly, for his third issue, Williams argues the court should have provided a jury instruction that the State must show Williams "possessed an amount of delta-9 tetrahydrocannabinol concentration equal to or more than 0.3% on a dry weight basis."

Regarding Williams' suppression motion, the district court did not err in finding the deputy had reasonable suspicion to extend the stop based on the combination of the strong air freshener, existence of black film canisters, and, most importantly, Williams' action in hiding the film canisters when the deputy was not present. With respect to Williams' second issue, the "hemp products" exception in the Commercial Industrial Hemp Act does not apply to liquid cartridges containing THC for use in vaporizing devices and even if it does—Williams' failure to assert the exception at trial makes his

2

appeal unavailing. Finally, the jury instruction related to the THC concentration was not legally appropriate and thus the district court did not err in refusing its use. The district court is therefore affirmed.

FACTUAL AND PROCEDURAL BACKGROUND

On August 30, 2021, a Johnson County Sheriff's deputy saw a vehicle on Highway K-10 with a temporary tag that appeared to be expired and, according to the deputy, was faded to be "barely visible." The deputy stopped the vehicle, and when the driver, later identified as Williams, rolled down the window the deputy noticed a "very strong odor of some sort of an air freshener," which the deputy later described as "overpowering." The deputy also noticed black film canisters in the driver's side door handle, and at least one of the canisters had a label that the deputy could not read. The deputy testified that his attention was drawn to the film canisters because he had found similar canisters before, which, from his training and experience, "typically house either some marijuana bud or some vape cartridges that usually contain THC."

At this time, the stop was still related to the faded and expired temporary tags. The deputy obtained Williams' driver's license and returned to his patrol car to verify the information, where he discovered that Williams had a couple of out-of-state misdemeanor warrants for failure to appear. After completing the check, the deputy went back to Williams' vehicle to ask for proof of insurance on the vehicle. Williams provided proof of insurance, and the deputy told him that he was giving him a verbal warning for the expired and faded tags. The deputy did not immediately return Williams' license or tell him that he was free to leave because he noticed the film canisters that were previously in the door handle were missing. This made the deputy believe "they must have contained an illegal substance" that Williams was trying to conceal.

3

The deputy testified that when he saw the canisters had been moved, the traffic stop became a drug investigation. The deputy asked Williams where the canisters went, and Williams "made a motion" and said they were in the center console. The deputy asked Williams what the containers were, and Williams said they were electronic cigarette cartridges. The deputy then asked if they were THC cartridges, and Williams said "yes." The deputy took possession of the film canisters and found vape cartridges with labels from a company called "Colorado Cannabis." The label had a red square on it with the letters "THC," and below the square the label said it contained marijuana.

After placing Williams under arrest, the deputy searched Williams and found a small scale. The deputy also searched the vehicle and found an air freshener and an electronic vaping device with a cartridge attached labeled similarly to the cartridge in the film canister. The State charged Williams with one count of possession of a controlled substance after having two prior convictions, and one count of possession of drug paraphernalia.

Williams later moved to suppress the evidence from the stop by arguing that the deputy lacked reasonable suspicion to extend the scope of the traffic stop to an investigation. After conducting a hearing, at which the deputy testified, the district court denied Williams' motion. The district court explained that the deputy had reasonable suspicion to inquire about the canisters that he had seen on the driver's side "particularly when he returned to the vehicle and saw that those canisters had been removed from the place where they were originally."

Williams had a jury trial on March 20, 2023, where the State presented two witnesses, including the deputy who made the stop and a forensic scientist with the Johnson County Sheriff's Crime Lab. The State also presented seven exhibits—which the court admitted into evidence—including photographs of the items confiscated in the search and the laboratory reports regarding the substance found in one of the vape

4

cartridges. The forensic scientist testified that the liquid found in one of the cartridges tested positive for delta-9, tetrahydrocannabinol, commonly called THC. During cross-examination, the forensic examiner said that he could not testify as to the concentration of the amount of THC within the liquid and the lab report did not contain the amount of THC in the cartridges.

The jury returned a verdict convicting Williams of both charges. The district court denied Williams' motion for judgment of acquittal based on his claim that the State failed to prove that the amount of THC possessed "is equal to or greater than 0.3% on a dry weight basis as codified in K.S.A. 2-3901." The district court sentenced Williams to 22 months in prison but then suspended his sentence and placed him on probation.

Williams now appeals.

DISCUSSION

Williams raises three issues on appeal. First, Williams argues the district court erred in denying his motion to suppress evidence from the traffic stop because the deputy lacked reasonable suspicion to extend the stop. Second, Williams challenges the sufficiency of the evidence supporting his conviction for unlawful possession of THC. Williams' third claim of error relates to the second claimed error and is based on the district court's refusal to give a jury instruction excluding "hemp products" from the definition of unlawful controlled substances.

I.       THE DISTRICT COURT'S DENIAL OF THE SUPPRESSION MOTION

Williams argues the deputy lacked reasonable suspicion to extend the traffic stop to a drug investigation after telling Williams he was only giving him a warning for the

expired and faded tag. Essentially, Williams argues the deputy was obligated to return his driver's license at that point and not ask any further questions.

When a defendant moves to suppress evidence alleging an unlawful seizure, the State has the burden to show by a preponderance of the evidence that the search and seizure were lawful. *State v. Pollman*, 286 Kan. 881, 886, 190 P.3d 234 (2008). After a district court denies a motion to suppress, this court must determine whether the district court's findings of fact are supported by substantial competent evidence and then review the ultimate legal conclusion de novo. *State v. Garrett*, 319 Kan. 465, 469, 555 P.3d 1116 (2024). In a case like this, where the facts are generally uncontroverted, appellate review becomes a question of law over whether reasonable suspicion existed to extend the stop beyond the purpose of the original traffic infraction. *State v. Mendez*, 319 Kan. 718, 735-36, 559 P.3d 792 (2024).

The Fourth Amendment to the United States Constitution protects people from unreasonable governmental searches and seizures. U.S. Const. amend. IV. It is well settled that the time when an officer stops a vehicle for a traffic infraction constitutes a seizure under the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 135 L. Ed. 2d 89 (1996); *State v. Jimenez*, 308 Kan. 315, 316, 420 P.3d 464 (2018). Therefore, a traffic stop is constitutionally limited to the time reasonably required to complete the traffic stop unless other circumstances lead to prolonging the stop for further investigation, which also permits extending the seizure. *Jimenez*, 308 Kan. at 323-24.

When conducting a traffic infraction stop and investigation, it is generally expected that the investigating officer can make inquiries about a person's driver's license; check for warrants; inspect the registration and proof of insurance; and "may also take 'negligibly burdensome precautions' to complete the stop safely." *Jimenez*, 308 Kan. at 317. The seizure for a traffic stop remains lawful as long as unrelated inquiries do not

"measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333, 129 S. Ct. 781, 172 L. Ed. 2d 694 (2009). An officer "may not conduct nonconsensual inquiries unrelated to the mission in a way that prolongs the stop—without the reasonable suspicion ordinarily demanded to justify detaining an individual." *Jimenez*, 308 Kan. at 323-24. Therefore, a traffic stop generally may not be extended to permit a fishing expedition for other potential criminal activity. Even so, the officer need not have a "blind eye" to other potential infractions and need not disregard information that may lead them to suspect independent criminal activity. 308 Kan. at 324.

Williams was detained for faded and allegedly expired temporary tags, so the traffic stop was limited to the time reasonably necessary to complete that investigation unless the State can show that the deputy formed a reasonable suspicion that Williams was involved in criminal activity. *Rodriguez v. United States*, 575 U.S. 348, 355, 135 S. Ct. 1609, 191 L. Ed. 2d 492 (2015); *Jimenez*, 308 Kan. at 316. Reasonable suspicion is "'"a particularized and objective basis" for suspecting the person stopped' is engaged in criminal activity." 308 Kan. at 324. Reasonable suspicion means something less than probable cause but requires more than a hunch or unparticularized suspicion. 308 Kan. at 324.

This court reviews the evidence for reasonable suspicion under "the totality of the circumstances in the view of a trained law enforcement officer," to determine whether reasonable suspicion existed. When determining whether reasonable suspicion existed, the court considers that officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *State v. Lowery*, 308 Kan. 359, Syl. ¶ 4, 366, 420 P.3d 456 (2018). "[T]he court must judge the officer's actions in light of common sense and ordinary human experience" and must give "'due weight' to the factual inferences drawn" by law enforcement officers. 308 Kan. 359, Syl. ¶ 4, 366.

7

After stopping Williams for a traffic violation, the deputy smelled an overpowering air freshener, but not the odor of marijuana. At that moment, the deputy alleges the strong odor of air freshener created suspicion because in his experience the use of a strong air freshener is "typically used . . . to cover up the smell of marijuana." The district court did not find that the strong smell of air freshener was enough to give the deputy reasonable suspicion of criminal activity and neither does this court.

At the same time the deputy noticed the strong air freshener, the deputy saw the black film canisters in the driver's side door handle that also made the deputy suspicious. According to the deputy, he was familiar with "[t]he size and the shape of the canisters" and knew "they typically house either some marijuana bud or some vape cartridges that usually contain THC" that have been purchased from a dispensary. However, that is of course not the only use of film canisters. Simply having film canisters under these circumstances was still likely not enough to give the deputy reasonable suspicion to extend the stop. See *State v. Jones*, 300 Kan. 630, 646-49, 333 P.3d 886 (2014) (finding presence of empty baggie insufficient to form reasonable suspicion of criminal activity). Even so, Williams moved the canisters, which tips the balance in this case.

When the deputy returned to Williams' vehicle after checking the driver's license, the film canisters were no longer in plain sight. The district court found that the deputy had reasonable suspicion to inquire about the canisters "when [the deputy] returned to the vehicle and saw that those canisters had been removed from the place where they were originally." The court found that the deputy had training and experience informing him that those canisters were used to hold marijuana, and that when the deputy noticed the canisters had been moved, it gave the deputy a sufficient basis to make further inquiry.

It was only after the deputy noticed the canisters were no longer in the driver's door that the deputy questioned Williams about their whereabouts and contents. The deputy testified that after Williams answered that the canisters were now concealed in the

8

center console, he inquired if the canisters were "THC cartridges" and Williams responded affirmatively.

While Williams correctly notes that the district court did not find the smell of air freshener constituted reasonable suspicion to extend the stop to investigate other criminal activity, the smell was not the only consideration. Coupled with other factors, the strong odor of air freshener can be a component of the totality of the circumstances creating a reasonable suspicion. See *State v. Schooler*, 308 Kan. 333, 353, 419 P.3d 1164 (2018) (court found that despite having legitimate retail purposes, a masking agent may be used to conceal drugs and may be considered when determining whether an officer had reasonable suspicion to further detain); *State v. Arceo-Rojas*, 57 Kan. App. 2d 741, Syl. ¶ 16, 458 P.3d 272 (2020) ("Because air freshener and other strong fragrances are known for masking drug odor, air freshener and other strong fragrances may contribute to a police officer's reasonable suspicion.").

Relying on the Kansas Supreme Court's holding in *Jones*, Williams contends the film canisters also do not create reasonable suspicion of criminal activity. 300 Kan. at 647-48. In *Jones*, the defendant moved to suppress evidence found from a search of her car by arguing the officer lacked reasonable suspicion to extend the traffic stop. 300 Kan. at 641. The officer's reason to extend the stop included that Jones' mouth was dry and her words were slurred, that she had been driving erratically, and that the officer saw an empty, clear plastic baggie, which to the officer suggested the possibility of drugs. 300 Kan. at 643-44. On review, the Kansas Supreme Court upheld the district court's decision to suppress evidence found in the defendant's car based on a lack of reasonable suspicion to extend a traffic stop. 300 Kan. at 647-48.

The court confirmed that calling a drug-sniffing dog to the scene was "constitutionally valid, as long as it did not prolong the stop beyond the time necessary to accomplish the original purpose of issuing a traffic citation." 300 Kan. at 641. After

9

discussing the other reasons for extending the stop, the court focused on the plastic baggie and found it did "not significantly add to the suspicion." 300 Kan. at 647-48. Specifically, the court held that the baggie being out in plain sight undercut its suspicious character:

> "Common sense suggests that if the bag had been used to package illegal substances, Jones or her companions would have hidden the bag along with its contents. There is no evidence of an attempt to do so before, during, or after the stop. Furthermore, as the Court of Appeals majority observed, there are a multitude of innocent uses for clear plastic bags and the presence of such a bag is not suspicious, at least by itself. . . .

> "Granted, suspicion might arise if the corner of the baggie had been cut off in a manner often used for packaging illegal substances or the bag had been tied in a knot." *Jones*, 300 Kan. at 647-48.

Williams argues that this case is like *Jones* in that it involves a single factor, the black film canisters, which are common household items used for many non-criminal activities. See 300 Kan. at 648 (noting that clear baggies have "a multitude of innocent uses"). However, Williams ignores several distinguishing factors between the *Jones* case and this one. First, this court does not agree that film canisters are synonymous with plastic baggies. While clear plastic baggies are available for purchase at almost any grocery, convenience, or big-box department store and can be used for incalculable everyday purposes, the same cannot be said for film canisters. Film canisters are not as widely available for purchase and, given the steep decline of film-based photography, it is less likely that a person would have leftover film canisters to use for button, coin, or bead storage. Second, film canisters offer fewer storage options than plastic baggies given their diminutive size and inability to stretch or conform to accommodate differently shaped items. While this court agrees that the film canisters alone did not provide the deputy with the requisite reasonable suspicion of criminal activity, it does not find their presence as unpersuasive as the presence of a clear plastic baggie.

10

This case demonstrates the importance of the court's obligation to view the totality of the circumstances when determining whether reasonable suspicion existed. While none of the facts alone may support a finding of reasonable suspicion, together they do. The deputy smelled a strong odor of air freshener, which in the deputy's experience is often used to mask the smell of marijuana—and the deputy was not required to ignore that knowledge. See *Arceo-Rojas*, 57 Kan. App. 2d at 761. In addition to the strong air freshener, the deputy saw the film canisters, which the deputy also believed are frequently used for storing illegal drugs. Finally, the factor that distinguishes this case from others, including *Jones*, is that Williams took steps to conceal the film canisters when the deputy was not looking.

It is the movement and concealment of the film canisters that sets this case apart and, coupled with the other facts, creates a reasonable suspicion to extend the stop to investigate further. Upon returning to Williams' vehicle after checking the license, the deputy immediately noticed that the black film canisters had been moved. In *Jones*, the court noted that the clear plastic baggie was not hidden and "[t]here is no evidence of an attempt to do so before, during, or after the stop." *Jones*, 300 Kan. at 647-48. Here, Williams moved and concealed the film canisters, which added to the deputy's reasonable suspicion that Williams was involved in criminal activity and attempting to conceal illegal substances. See *State v. May*, No. 93,221, 2006 WL 213861, at *2 (Kan. App. 2006) (unpublished opinion) (The officer had reasonable suspicion that a crime was being committed based, in part, on the defendant's "furtive action to conceal the can from view."). Courts have consistently held that furtive actions to conceal or hide items can add to the totality of circumstances to establish reasonable suspicion of criminal activity. See, e.g., *United States v. DeJear*, 552 F.3d 1196, 1200-01 (10th Cir. 2009). Unlike in cases where an officer sees movement consistent with concealment, but not the item concealed, here the deputy knew exactly the item concealed and that item carried its own suspicious character.

11

When viewed collectively, the facts here support the district court's finding that the deputy had reasonable suspicion to extend the traffic stop to ask Williams about the location of the film canisters. Accordingly, the district court did not err in denying the motion to suppress.

## II.   SUFFICIENCY OF THE EVIDENCE SUPPORTING WILLIAMS' CONVICTION

Next, Williams argues the State failed to present sufficient evidence to support his conviction for possession of THC. Williams contends the language of K.S.A. 2021 Supp. 65-4105(h)(1) and K.S.A. 2-3901, when read together, creates an exception from Kansas' controlled substance list for legally possessed hemp products that contain no more than 0.3% of THC. Therefore, Williams claims the State's failure to introduce evidence that the cartridges contained at least 0.3% THC means it failed to prove the alleged substance met the definition of a Schedule I controlled substance under K.S.A. 2021 Supp. 65-4105(h)(1).

When the sufficiency of the evidence is challenged, this court reviews the evidence in the most favorable light to the State "to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt." *State v. Kemmerly*, 319 Kan. 91, 102, 552 P.3d 1244 (2024). A conviction can be based entirely on circumstantial evidence so long as the evidence permits the fact-finder to draw reasonable inferences regarding the facts in issue. *State v. Banks*, 306 Kan. 854, 858-59, 397 P.3d 1195 (2017). Part of Williams' sufficiency of the evidence challenge hinges on statutory interpretation, which is a question of law subject to unlimited review. *State v. Brazzle*, 311 Kan. 754, 766, 466 P.3d 1195 (2020). After interpreting the relevant statutes, the court will determine whether the State presented sufficient evidence to support Williams' possession conviction.

The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. *H.B. v. M.J.*, 315 Kan. 310, 320, 508 P.3d 368 (2022). In determining legislative intent, Kansas courts read statutory language by giving common words their ordinary meanings. *Johnson v. U.S. Food Serv.,* 312 Kan. 597, 600-01, 478 P.3d 776 (2021). When a statute is plain and unambiguous, Kansas courts will not speculate about the legislative intent or read something into the statute that is not readily found in its words. *Schmidt v. Trademark, Inc.*, 315 Kan. 196, 200, 506 P.3d 267 (2022). Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history to construe the Legislature's intent. *Chalmers v. Burrough*, 314 Kan. 1, 8, 494 P.3d 128 (2021).

Further, when construing statutes to determine legislative intent, Kansas courts must consider various provisions of an act *in pari materia* to reconcile and bring the provisions into workable harmony if possible. *Roe v. Phillips County Hospital*, 317 Kan. 1, 5-6, 522 P.3d 277 (2023); see also *State v. Newman-Caddell*, 317 Kan. 251, 259, 527 P.3d 911 (2023) ("The doctrine of *in pari materia* means that statutes relating to the same matter may be read together to discern intent."). This court does not review statutes in isolation, instead it views "all relevant parts together," including the context of the language at issue. See *Johnson v. Bass Pro Outdoor World, LLC*, 320 Kan. 325, 339, 567 P.3d 810 (2025) (context); *Bruce v. Kelly*, 316 Kan. 218, 230, 514 P.3d 1007 (2022) (parts together). Such a reading ensures that even when considering various provisions of a statute, this court attempts to "reconcile and bring those provisions into workable harmony, if possible." 316 Kan. at 224.

Finally, Kansas courts generally presume that the Legislature acts with full knowledge about statutory subject matter, including prior and existing law and judicial decisions interpreting the same. *In re M.M.*, 312 Kan. 872, 875, 482 P.3d 583 (2021). But see *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 718, 317 P.3d 70 (2014)

13

(adopting plain wording of the statute, leaving it to the Legislature to modify the statute if it did not intend an illogical and unreasonable result).

Williams' sufficiency argument can be addressed in two ways. First, the State contends—and this court agrees—that the "hemp products" exception is inapplicable to Williams' offense in this case. Second, even if the exception applies, Williams' failure to assert the exception at trial undermines his claim on appeal.

1. *The hemp products exception was inapplicable to Williams' offense.*

Williams' appeal requires this court to consider four statutes found in different chapters of the state's code:

- K.S.A. 21-5706(b)(7), the statute making it unlawful to possess certain controlled substances, found in Article 57 "Crimes Involving Controlled Substances" within Chapter 21 "Crimes and Punishments";
- K.S.A. 2021 Supp. 65-4105(h), the statute defining controlled substances, found in Article 41 "Controlled Substances" within Chapter 65 "Public Health";
- K.S.A. 2-3901(b), the statute delineating definitions under the Commercial Industrial Hemp Act, found in Article 39 "Industrial Hemp" within Chapter 2 "Agriculture"; and
- K.S.A. 2-3908, the statute in the Commercial Industrial Hemp Act describing unlawful hemp products, also found in Article 39 "Industrial Hemp" within Chapter 2 "Agriculture."

The State charged Williams with unlawful possession of a controlled substance in violation of K.S.A. 21-5706(b)(7), which makes it unlawful "for any person to possess . . . any substance designated in K.S.A. 65-4105(h)." The State was therefore required to

14

demonstrate that Williams possessed the controlled substance defined in K.S.A. 2021 Supp. 65-4105(h), which includes "[a]ny of the following cannabinoids, their salts, isomers and salts of isomers, unless specifically excepted . . . Tetrahydrocannabinols." K.S.A. 2021 Supp. 65-4105(h)(1). See *State v. Wilt*, 273 Kan. 273, 275-78, 44 P.3d 300 (2002) (State must prove that statutory definition of element of offense was met). That seems simple enough, but the definition of THC has exceptions.

According to Williams, the State was therefore required to prove the THC did *not* fall within one of the exceptions, specifically the "hemp products" exception set forth in K.S.A. 2021 Supp. 65-4105(h)(1)(C). The Uniform Controlled Substances Act defines THC as a controlled substance "except tetrahydrocannabinols in any of the following: . . . (C) hemp products, as defined in K.S.A. 2-3901, and amendments thereto, unless otherwise deemed unlawful pursuant to K.S.A. 2-3908, and amendments thereto" of the Commercial Industrial Hemp Act. K.S.A. 2021 Supp. 65-4105(h)(1)(C). Williams focuses on the "hemp products" provision because it is unique to the definition of THC as a controlled substance—that is, "hemp products" is not an exception to the definition of marijuana as a Schedule I controlled substance under K.S.A. 2021 Supp. 65-4101(aa)— and is included in the statutory provision identifying THC as a Schedule I controlled substance. The significance of Williams' arguments, which have been made in other cases, is addressed later. See *State v. Jeffrey*, No. 128,518, 2026 WL 709772, at *1 (Kan. App. 2026) (unpublished opinion) (defendant argued State failed to prove the THC he possessed was illegal because there was no evidence the sample exceeded 0.3%).

The Commercial Industrial Hemp Act defines "'[h]emp products'" as "all products made from industrial hemp, including, but not limited to, cloth, cordage, fiber, food, fuel, paint, paper, particleboard, plastics, seed, seed meal and seed oil for consumption and any extract from industrial hemp intended for further processing." K.S.A. 2-3901(b)(4). It then provides that the "[f]inal 'hemp products' may contain a tetrahydrocannabinol concentration of not more than 0.3%." K.S.A. 2-3901(b)(4). Reading these together,

15

Williams asks this court to conclude that so long as Williams' vape cartridge possessed less than 0.3% THC it was excepted from the definition of THC as an unlawful controlled substance.

However, that reading ignores the part of the "hemp products" exception that states "hemp products" are only an exception to the definition of THC as a Schedule I Controlled Substance when they are not "otherwise deemed unlawful pursuant to K.S.A. 2-3908." K.S.A. 2021 Supp. 65-4105(h)(1)(C). This means that "hemp products" only constitute an exception to the offense of unlawful possession of the controlled substance THC when the hemp products are not otherwise unlawful under the Commercial Industrial Hemp Act. K.S.A. 21-5706(b)(7); K.S.A. 2021 Supp. 65-4105(h)(1)(C); K.S.A. 2-3908. The Commercial Industrial Hemp Act has a provision titled "[u]nlawful hemp products" in K.S.A. 2-3908 which states that "[i]t shall be unlawful for any of the following hemp products to be manufactured, marketed, sold or distributed by any person in the state of Kansas: . . . liquids, solids or gases containing *industrial hemp for use in vaporizing devices*." (Emphasis added.) K.S.A. 2-3908(a)(1)(E). "'Industrial hemp'" is defined as "all parts and varieties of the plant cannabis sativa L . . . that contain a delta-9 tetrahydrocannabinol concentration of not more than 0.3% on a dry weight basis." K.S.A. 2-3901(b)(7). Thus, the Commercial Industrial Hemp Act defines all liquids containing THC for use in vaporizing devices, regardless of the concentration of THC, as a hemp product that "shall be unlawful" to manufacture, market, sell, or distribute in Kansas. K.S.A. 2-3908(a)(1)(E); K.S.A. 2-3901(b)(4), (7). Williams contends this provision is inapplicable because the Commercial Industrial Hemp Act does not make it unlawful to simply "possess" liquids containing *industrial hemp* for use in vaporizing devices—and he was merely charged with possession of THC.

Instead, Williams maintains that the Commercial Industrial Hemp Act only makes it unlawful to manufacture, market, sell, or distribute those identified hemp products. Williams' argument is unpersuasive because he was not charged with violating the

16

Commercial Industrial Hemp Act. Rather, Williams was charged with possession of a controlled substance under the Uniform Controlled Substances Act, and he crafts an argument where the Commercial Industrial Hemp Act creates a broad exception to the unlawful possession of THC under the Controlled Substances Act for a product that is unlawful under the Commercial Industrial Hemp Act. Not only is this inconsistent with a plain reading of the statute, but it would also create an absurd result.

The Commercial Industrial Hemp Act concerns commercial production of industrial hemp and provides a legal avenue for licensed and registered hemp producers and processors to cultivate industrial hemp for permitted purposes. K.S.A. 2-3901(b)(1), (4), (5). Williams argues for an inconsistent result where the Legislature in the Commercial Industrial Hemp Act made it unlawful for licensed industrial hemp producers to produce, sell, or market liquids, solids, or gases containing any amount of THC for use in vaporizing devices, and simultaneously created an exception to the prohibition against the possession of the same THC product under the Uniform Controlled Substances Act. That is an untenable proposition, inconsistent with a clear reading of the applicable statutes, and the court does not construe the Commercial Industrial Hemp Act in such a manner.

In short, the "'[h]emp products'" exception within the Commercial Industrial Hemp Act is inapplicable to Williams' charged offense under the Uniform Controlled Substances Act because cartridges containing THC for use in vaporizing devices are unlawful hemp products under the Commercial Industrial Hemp Act.

17

2. *Sufficient evidence can support a conviction for unlawful possession of THC without proof that the exceptions in the Commercial Industrial Hemp Act do not apply.*

If the "hemp products" exception applies here, Williams argues the State was required to prove the THC did not fall within an exception to the definition of controlled substance because the exception is integral to the definition of THC as a controlled substance. The State contends that Williams' failure to introduce evidence that the cartridges met the "hemp products" exception fatally flaws his argument on appeal. See *State v. White*, 213 Kan. 276, 280, 515 P.2d 1081 (1973) (holding that "the accused has the burden of introducing evidence as a matter of defense that [they are] within an exception or exemption in the statute creating the offense, where such exception or exemption is not part of the description of the offense"); *State v. Gunn*, 29 Kan. App. 2d 337, 342, 26 P.3d 710 (2001) ("[A] defendant has the burden of presenting evidence that would bring him or her within an exception to the act proscribed within the criminal statute, unless the exception is a part of the description of the offense.").

The Kansas Supreme Court recently considered a similar issue. See *State v. Brown*, 321 Kan. 1, 573 P.3d 237 (2025). In *Brown*, the defendant was charged with distribution of marijuana as a predicate felony for a charge of first-degree felony murder. The State relied on witness testimony to prove Brown distributed marijuana—the witness familiar with marijuana testified he smelled it and looked at it to make sure it was "good." 321 Kan. at 9-10. Brown maintained the State needed to prove the substance was not subject to an exception found at K.S.A. 2021 Supp. 65-4101(aa), which listed exceptions to the definition of marijuana. 321 Kan. at 6, 17. The relevant statutory language defined marijuana as "all parts of all varieties of the plant Cannabis whether growing or not, the seeds thereof, the resin extracted from any part of the plant and every compound, manufacture, salt, derivative, mixture or preparation of the plant, its seeds or resin." 321 Kan. at 5-6. However, K.S.A. 2021 Supp. 65-4101(aa) identified exceptions

18

to this definition, including, "(1) the mature stalks of the cannabis plant; (2) any substance listed in Schedules II through V of the Uniform Controlled Substances Act; (3) cannabidiol; and (4) industrial hemp, as defined in K.S.A. 2-3901." 321 Kan. at 6.

The Kansas Supreme Court disagreed with Brown's argument, ruling that the State was not required to prove that the marijuana did not meet one of the listed exceptions to the definition of marijuana. 321 Kan. at 8. The court concluded that "[w]hile the presence of THC in a substance may be relevant to a fact-finder's determination of whether a substance is marijuana, '[p]roof of the presence of THC is not required to meet the statutory definition of marijuana.'" 321 Kan. at 8 (citing *State v. Baldwin*, No. 124,442, 2023 WL 5163292 [Kan. App. 2023] [unpublished opinion]).

In making this determination, the *Brown* court cited *State v. Baldwin*, a recent unpublished opinion from this court, where the defendant argued there was insufficient evidence to support his conviction for possession of marijuana because the evidence did not prove that the alleged marijuana met the legal definition of marijuana. 2023 WL 5163292, at *2. Baldwin's argument was that the State failed to prove the substance was *not* industrial hemp, meaning it had a THC "concentration of not more than 0.3% on a dry weight basis." K.S.A. 2-3901(b)(7). 2023 WL 5163292, at *5. Baldwin also argued the State failed to prove none of the other exceptions applied. The court, relying on the Kansas Supreme Court's ruling in *Brazzle*, found Baldwin failed to claim any exceptions applied—that is, he argued the State failed to show an exception was not applicable but did *not* argue an exception applied. 2023 WL 5163292, at *5-6. Without deciding whether the exception constituted an affirmative defense, the panel found Baldwin was required to have asserted an exception applied before the State would need to prove that it did not apply. 2023 WL 5163292, at *5-6. As a result, the court found sufficient evidence supported Baldwin's conviction. 2023 WL 5163292, at *5-6.

19

Williams argues that this case is distinguishable from *Baldwin,* and thus *Brown,* because it involves the unlawful possession of THC, not marijuana. More specifically, Williams contends that the Legislature created an "explicit exemption" within the unlawful possession of THC offense for legal "hemp products," but the marijuana offense in K.S.A. 2021 Supp. 65-4105(d)(17) contains no similar "explicit exemption."

Williams is correct that the Schedule I controlled substances statute (K.S.A. 2021 Supp. 65-4105) lists the exceptions (including "hemp products" as defined by the Commercial Industrial Hemp Act) within that statute but does not similarly include the "hemp products" exception for marijuana. When a person is charged with unlawful possession of marijuana, the statute does not include an exception within the statute listing marijuana as a *controlled substance* in the same manner as it does for people charged with unlawful possession of THC. Williams contends that the "hemp products" exception is so integral to the definition of THC that it should be viewed as an element of the crime, and not an exception requiring the defendant to raise it as a type of affirmative defense.

Undercutting Williams' argument is that the Schedule I controlled substances statute in K.S.A. 2021 Supp. 65-4105(h) lists three exceptions for THC, including "[i]ndustrial hemp," and the definition of marijuana in K.S.A. 2021 Supp. 65-4101(aa) within that same statutory scheme also includes an exception for "industrial hemp . . . used for activities authorized by the commercial industrial hemp act." So, the "hemp products" exception to THC receives no special statutory placement or consideration from the other THC exceptions, including "[i]ndustrial hemp" which is also included as an exception in the definition of marijuana. K.S.A. 2021 Supp. 65-4105(h) (THC as controlled substance); K.S.A. 2021 Supp. 65-4101(aa) (definition of marijuana with exceptions). That is the very exception the defendant in *Baldwin* relied on and the court considered. See 2023 WL 5163292, at *3.

20

Williams does not persuasively argue why the THC "hemp products" exception should receive unique treatment from the THC "industrial hemp" exception or the marijuana "industrial hemp" exception. Additionally, Williams fails to support the conclusion that the THC exceptions being listed within the Schedule I controlled substances statutory provision in K.S.A. 2021 Supp. 65-4105 makes them more integral to the offense of unlawful possession of THC than the marijuana exceptions listed in the definition section of K.S.A. 2021 Supp. 65-4101. The exceptions for both substances are contained within the same Act. Additionally, other substances in Schedule I have exceptions listed within the schedule, rather than in a separate definition. K.S.A. 2021 Supp. 65-4105(b)(7) (alphacetylmethadol and exception); K.S.A. 2021 Supp. 65-4105(c)(10) (etorphine and exception); K.S.A. 2021 Supp. 65-4105(f)(7) (substituted cathinones and exception). Finally, as Williams notes—marijuana and THC are different—and the statutory method for identifying their exceptions appears to reflect those differences, not distinguish the importance of their exceptions.

Williams fails to persuade this court that the exceptions to the definition of THC as a controlled substance are so integral to the offense as to require this court to deviate from the natural application of the Kansas Supreme Court's recent decision in *Brown*. See 321 Kan. at 9. The State is not required to prove a negative, in that the exceptions to THC do *not* apply. See *Brown*, 321 Kan. at 9 ("Nor was the State required to prove that the substance Brown was charged with distributing was not one of the listed exceptions to the definition of marijuana."); *State v. Davis*, 255 Kan. 357, 370, 847 P.2d 1156 (1994) (in an unrelated charge, finding State not required to prove a negative but rather the defendant has burden to introduce evidence that an exception applies); *Gunn*, 29 Kan. App. 2d at 342 ("[A] defendant has the burden of presenting evidence that would bring him or her within an exception to the act proscribed within the criminal statute, unless the exception is a part of the description of the offense.").

21

Therefore, to the extent "hemp products" is an exception to the definition of controlled substances for charges of unlawful possession of a cartridge containing THC for use in a vaporizing device, this court follows the rationale of the Kansas Supreme Court in *Brown* and concludes that Williams must demonstrate the exception's applicability. Williams failed to argue that the cartridge contained less than 0.3% THC at trial and thus failed to show the exception applied, if one exists.

All that remains is whether there was sufficient evidence to support Williams' conviction.

3. *There was sufficient evidence in Williams' case.*

Williams' sufficiency argument rests on the contention that the State was required to prove that Williams' cartridges contained at least 0.3% THC. As explained above, that contention is incorrect. Moreover, Williams does not present any evidence that the cartridges had less than 0.3% THC.

The State was merely required to show that the cartridges contained THC, and this could be done through circumstantial evidence. See *Brown*, 321 Kan. at 9. The State presented evidence that the deputy asked Williams if the film canisters were THC cartridges, and Williams said "yes." The vape cartridge contained a label showing it was from a company called "Colorado Cannabis," and the label also had a red square on it that stated "THC" and that it contained marijuana. Finally, the forensic scientist testified that the liquid found in one of the cartridges tested positive for delta-9, tetrahydrocannabinol, commonly called THC.

Viewing the evidence in a most favorable light to the State, a rational fact-finder could have found Williams guilty beyond a reasonable doubt. Not only did the substance test positive for THC, but Williams admitted the cartridges in his possession contained

THC. Accordingly, the State presented sufficient evidence to show that the cartridges contained any amount of THC and supported Williams' conviction for possession of a controlled substance in violation of K.S.A. 21-5706(b)(7) and K.S.A. 2021 Supp. 65-4105(h).

## III.     THE DISTRICT COURT DID NOT ERR IN FAILING TO INSTRUCT THE JURY ON THE AMOUNT OF THC

For the final claim of error, Williams argues the district court erred in refusing to instruct the jury regarding the exclusion of "hemp products" with less than 0.3% of THC from the definition of unlawful controlled substances. Williams' argument is based on his claim that the State had to show that the substance he possessed was not a legal "hemp product" with less than 0.3% of THC.

This court engages in a three-step process to review jury instruction errors. First, the appellate court determines whether it can or should review the issue, looking specifically at appellate jurisdiction and preservation of the issue. Second, the reviewing court considers the merits of the claim to determine whether the district court erred in instructing the jury. In this second step, the court determines whether the instruction was legally and factually appropriate, using a de novo review of the entire record. Third, if the jury was improperly instructed, the appellate court assesses whether the error requires reversal or can be deemed harmless. *State v. Hollins*, 320 Kan. 240, 242, 564 P.3d 778 (2025); *State v. Bentley*, 317 Kan. 222, 242, 526 P.3d 1060 (2023).

Before trial, Williams proposed a jury instruction that included an additional element that the State must prove that he "possessed an amount of delta-9 tetrahydrocannabinol concentration equal to or more than 0.3% on a dry weight basis." The district court denied Williams' request to instruct the jury with the additional element, finding that THC is a controlled substance under Schedule I, and there is no

23

requirement in K.S.A. 21-5706(b)(7) or K.S.A. 2021 Supp. 65-4105(h) that the THC must be equal to or more than 0.3% on a dry weight basis.

Jury instruction No. 12 provided: "The defendant is charged with unlawfully possessing tetrahydrocannabinol. The defendant pleads not guilty. To establish this charge, each of the following claims must be proved: 1. The defendant possessed tetrahydrocannabinol. 2. This act occurred on or about the 30th day of August, 2021, in Johnson County, Kansas." Williams then objected to jury instruction No. 12—which was modeled after the existing pattern jury instructions—and he again asked that his proposed instruction be used in its place.

Williams properly preserved the issue for appeal. The court will first decide whether the proposed instruction was legally appropriate, about which this court exercises unlimited review. *Hollins*, 320 Kan. at 242. This issue is intertwined with the analysis in Issue II, and it fails for the same reasons. Primarily, as discussed above, the State need not prove that the liquid substance in the cartridge contained "a delta-9 tetrahydrocannabinol concentration of not more than 0.3% on a dry weight basis" as set forth in K.S.A. 2-3901(b)(7). Rather, the elements of possession were accurately set forth in the jury instruction given by the district court.

Even so, as set forth by the Kansas Supreme Court in *Brown*, to the extent an exception to the prohibition of a controlled substance applies here—Williams was required to demonstrate the exception's applicability. See 321 Kan. at 9. Therefore, the requested instruction was not legally appropriate. Accordingly, the district court did not err in denying Williams' request for an altered PIK jury instruction.

24

CONCLUSION

When Williams moved the film canisters out of the deputy's plain view, the totality of the circumstances, including the overwhelming smell of air freshener, gave the deputy reasonable suspicion to extend the traffic stop into an investigation for criminal activity. Therefore, the district court did not err in denying Williams' suppression motion. The evidence was sufficient for a jury to convict Williams of possession of THC, and the State had no burden to prove the concentration of THC found in the cartridges for use in vaporizing devices. Even if Williams had raised the exception, it would not apply to him. Williams was therefore not entitled to a jury instruction requiring the jury to find he possessed a certain percentage of THC.

Affirmed.